Deanna MILLIGAN, Appellant,

v.

CHESTERFIELD VILLAGE GP, LLC, d/b/a Chesterfield Village Apartments, LP, and McCormack Baron Ragan Management Services, Inc., Respondents.

No. 28179.

Missouri Court of Appeals, Southern District, Division One.

Sept. 12, 2007.

David W. Ansley and Steven J. Blair, Springfield, for appellant.

Randy Scheer and Jacob Sappington, Springfield, for respondent.

DANIEL E. SCOTT, Judge.

On July 16, 2007, this court adopted an opinion in this case. On July 18, 2007, this case was transferred to the Missouri Supreme Court pursuant to Rule 83.03. On August 22, 2007, the Missouri Supreme Court retransferred the case to this court. This court's original opinion now is readopted.

We consider in this case whether an exculpatory clause is effective, and if so, who can claim its protection.

Plaintiff was injured when she fell two stories while saving herself and her children from a fire that destroyed their apartment building.[1] She sued the apartment's owner (Chesterfield) and management company (McCormack), alleging negligence as to fire and city codes and ordinances, apartment rules and policies, smoke alarm inadequacies, and other matters.

Defendants asserted an affirmative defense of release, and eventually moved for summary judgment, based on the exculpatory clause plaintiff read and initialed when she signed her apartment lease:

27. WAIVER OF LIABILITY

Lessee hereby agrees that Lessor shall not be liable to Lessee, his family, guests, invitees, servants, or others for injury to or death of any person or pet, nor for loss or damage to property (including the property of Lessee) occurring in or about the Leased Premises from any cause whatsoever, even if the cause or damages or injuries are alleged to be the fault or caused by the negligence or carelessness of the Lessor. /s/DM (Lessee(s) initials) (Language taken from Warren vs. Paragon Technologies Group, Inc.)

Plaintiff cross-moved for a partial summary judgment declaring Paragraph 27 unenforceable. The trial court ultimately granted defendant's motion for summary judgment and denied plaintiff's cross-motion.[2]

## Legal Principles

 Our review is *de novo*. *ITT Commercial Finance Corp. v. Mid—America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). A liability limitation's validity is a question of law. *Warren v. Paragon Technologies Group*, 950 S.W.2d 844, 845 (Mo. banc 1997). This court is not bound by the trial court's contract interpretation. *Wallace, Saunders, Austin, Brown & Enochs, Chartered v. Rahm*, 963 S.W.2d 419, 422 (Mo.App. 1998).

 Public policy disfavors but does not prohibit releases of future negligence. *Warren*, 950 S.W.2d at 845; *Alack v. Vic Tanny International of Missouri, Inc.*, 923 S.W.2d 330, 334 (Mo. banc 1996). *Alack*, Missouri's lead case, demands that exculpatory language "effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence." 923 S.W.2d at 337. Our traditional notions of justice are so fault-based that we require "clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence." *Id.*

---

1. A neighbor perished in the blaze. Her death is the subject of a companion case, *Kaufold v. Chesterfield Village GP, LLC, et al.*, # 28178, 2007 WL 2640732, 232 S.W.3d 699.

2. The court initially granted plaintiff's motion and denied defendants' motion. Defendant sought reconsideration and the court reversed its rulings.

Consumer contracts[3] must conspicuously employ "negligence," "fault" or equivalent words so that a clear and unmistakable waiver and shifting of risk occurs. *Id.*

### Point I—Paragraph 27's Enforceability

■ Lease Paragraph 27, titled "WAIVER OF LIABILITY," releases injury claims at or about the apartment "from any cause whatsoever, even if the cause or damages or injuries are alleged to be the fault or caused by the negligence or carelessness of the Lessor." Plaintiff, a high school graduate, read the lease before she signed it. She read and initialed, in particular, Paragraph 27's "WAIVER OF LIABILITY." Absent other evidence—and plaintiff cites none—this demonstrates the parties agreed upon this release. *Warren,* 950 S.W.2d at 846.

Given these circumstances, Plaintiff's Point I makes a narrow claim. It asserts, as a matter of law, Paragraph 27 is unenforceable because "from any cause whatsoever" does not expressly exclude intentional torts, gross recklessness, or activities involving the public interest. Plaintiff is not claiming the Lessor did not effectively notify her she was releasing it from its own negligence. *Alack,* 923 S.W.2d at 337. Plaintiff also is not claiming Paragraph 27 does not clearly, unambiguously, unmistakably, and conspicuously release future negligence liability. *Id.* Plaintiff does not challenge Paragraph 27 about "negligence"—plaintiff's claim in this case—at all. Instead, plaintiff contends Paragraph 27 is ambiguous and invalid because its language arguably is broad enough to include non-releasable liabilities not involved in this case. To illustrate, consider two hypothetical conversations that start similarly but end differently:

*First conversation:*

P: I sue you for negligence.

D: You already released me from all future claims, including my own future negligence. Your release of my negligence was clear, conspicuous, and effectively notified you that you were releasing me from future negligence claims. You are suing me for what you clearly and conspicuously released me from. Your claims are barred.

*Second conversation:*

P: I sue you for negligence.

D: You already released me from all future claims, including my own future negligence. Your release of my negligence was clear, conspicuous, and effectively notified you that you were releasing me from future negligence claims. You are suing me for what you clearly and conspicuously released me from. Your claims are barred.

P: But my release doesn't mention assault.

D: I didn't assault you. You're not suing me for assault. Assault doesn't matter.

P: Yes it does. My suit is for the negligence from which I clearly and conspicuously released you. But my release of "all" claims is silent about assault, and assault can't be released, so my release is automatically "ambiguous" and unenforceable. You didn't assault me, nor am I suing you for assault, but that

---

**3.** Less precise language may be effective between businesses of equal power and sophistication. *Alack,* 923 S.W.2d at 338 n. 4. Sophisticated businesses that negotiate at arm's length may limit liability without specifically mentioning "negligence," "fault," or an equivalent. *Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc.,* 59 S.W.3d 505, 509 (Mo. banc 2001).

makes no difference. A release of "any" or "all" claims that is silent about assault is legally unenforceable, even against the negligence claims it clearly and conspicuously releases.

The first conversation represents the trial court's basis for summary judgment. The second illustrates plaintiff's Point I. Plaintiff cites as support passages from *Alack* and *Lewis v. Snow Creek, Inc.*, 6 S.W.3d 388 (Mo.App.1999). Defendants reply that Paragraph 27 is modeled on a release they say *Warren* approved. 950 S.W.2d at 845—46.[4] We begin by reviewing *Alack*.

### Alack

*Alack's* principal and dissenting opinions focused almost exclusively on enforceability of its future negligence release. *See* 923 S.W.2d at 334—38; 339—46. The majority's analysis, titled "Release From Future Negligence," was in four sections.

█ Section 1, citing Missouri cases, reiterated that exculpatory clauses are not prohibited by our public policy, but are disfavored, never implied, and must be clearly and explicitly stated. Clear and explicit language is required to absolve a person from future negligence, and is strictly construed against the party claiming its benefit. *Id.* at 334 (citations omitted).

Section 2 examined decisions of our sister states, most of which "have enforced exculpatory clauses when they include specific references to the negligence or fault of the drafter." *Id.* The court cited Minnesota, Maine, North Dakota, and Delaware cases, and considered at greater length Texas and New York opinions, to the effect that exculpatory clauses must expressly mention the drafter's negligence or fault. *Id.* at 334—35. Section 2 also cited minority-view cases, including those holding that "any" and "all" language alone can be sufficient without specifically mentioning "negligence." *Id.* at 335—36.

Section 3 returned to Missouri cases. "Historically, Missouri appellate courts have required that a release from one's own future negligence be *explicitly* stated." *Id.* at 336. The court cited six examples, but focused on *Vergano v. Facility Management of Missouri, Inc.*, 895 S.W.2d 126 (Mo.App.1995), which upheld an exculpatory clause, and *Hornbeck v. All American Indoor Sports*, 898 S.W.2d 717 (Mo.App.1995), which did not. *Id.* at 336—37. Significantly as to plaintiff's Point I, both cases involved "any" and "all" language that plaintiff claims invalidates any exculpatory clause. Thus, we will discuss these cases again, *infra*.

Section 4 began by summarizing the lessons of sections 1—3:

We are persuaded that the best policy is to follow our previous decisions and those of other states that require clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence. The exculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence. Our traditional notions of justice are so fault-based that most people might not expect such a relationship to be altered, regardless of the length of an exculpatory clause, unless done so explicitly. General language will not suffice.

---

4. Our supreme court did not quote Warren's exculpatory clause in its opinion. *Warren* is the subject of Karen A. Read, Note, *Public Policy Violations or Permitted Provisions?: The Validity of Exculpatory Provisions in Residential Leases,* 62 Mo. L.Rev. 897 (Fall 1997), which purports to cite the clause.

*Id.* at 337. This announced no new law. Nor did these pronouncements, or to our knowledge the cases cited in sections 1—3, suggest plaintiff's Point I argument, let alone elevate it to equal billing with *Alack's* future negligence analysis.

 *Alack's* mention of ambiguity was in reply to defendant Tanny's claim that its clause was adequate (*Id.*), basically arguing the minority view that "any" or "all" covers negligence without using that word or its equivalents. "Any" and "all" seem unambiguous and all-encompassing, but not so under the law governing exculpatory clauses. The court perceived a "latent ambiguity" since Tanny's clause, while extensive, did not specifically release Tanny's negligence. *Id.* The court illustrated its point with other claims (intentional torts, gross negligence,[5] and public interest) that Tanny's clause also seemed broad enough to cover, yet one can never exonerate oneself from such liabilities. *Alack* did not involve such claims, but they also demonstrated the clause's ambiguity. *Id.* Plaintiff Alack and the jurors did not interpret the clause as Tanny did, and "our law on such an important point cannot be so out of step with the understanding of our citizens." *Id.* The court thus proposed:

> a bright-line test ... certain to alert all involved that the future 'negligence' or 'fault' of a party is being released. The words 'negligence' or 'fault' or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs.

*Id.* This would leave "no doubt that a reasonable person agreeing to an exculpatory clause actually understands what future claims he or she is waiving." *Id.* at 337—38. The court mentioned nothing in this bright-line test or its purpose that supports plaintiff's Point I. The court's remedy, even if Tanny's clause had several latent ambiguities, involved only "negligence," presumably because *Alack* involved only negligence claims. Passing mention of other ambiguity seems merely an illustration, not a second disqualifying rule as Point I claims. Otherwise, a drafter's compliance with *Alack's* future negligence pronouncements would be for naught unless all possible "latent" ambiguities—although irrelevant to the case— were hypothesized and addressed. The *Alack* court devoted considerable care and many pages researching, expressing, and supporting its future negligence pronouncements. If the court meant to add a second disqualifying rule supporting plaintiff's Point I, we think it would done so more clearly, unambiguously, unmistakably, and conspicuously.

*Alack's* approval of *Vergano* and *Hornbeck* strengthens this conclusion. Both cases involved "any" and "all" language that plaintiff claims *Alack* condemns, but *Vergano's* clause mentioned "negligence" and *Hornbeck's* did not. *Vergano*, 895 S.W.2d at 127; *Hornbeck*, 898 S.W.2d at 719—20. *Vergano's* clause was approved despite its "any" and "all" language.

---

**5.** Our general tort law does not recognize degrees of negligence. *Tendai v. Bd. of Reg. for Healing Arts*, 161 S.W.3d 358, 367 n. 6 (Mo. banc 2005). "The plaintiff gains nothing by branding the negligence 'gross'" because in cases since 1869, Missouri courts have refused to recognize differing degrees of negligence. *Sherrill v. Wilson*, 653 S.W.2d 661, 664 (Mo. banc 1983). Thus, a drafter trying to address this *Alack* illustration by releasing, for example, "negligence, but not gross negligence," may create a more troublesome ambiguity instead. The *Alack* court, as shown *infra*, apparently considered and certainly treated ambiguities *other than negligence* as illustrations but not real problems in a case involving only negligence. But a release expressly releasing one but not another degree of negligence, if our law does not so differentiate, may create an ambiguity in a negligence case. *See also* note 6, *infra*, as to whether some latent ambiguities are ambiguities at all.

While *Hornbeck's* clause failed, the court indicated it would have upheld a release of "any and all loss or damage ... whether caused by the negligence of the Releasees or otherwise...." 898 S.W.2d at 721, *citing Haines v. St. Charles Speedway,* 689 F.Supp. 964, 969 (E.D.Mo.1988). If Point I is correct, *Alack* should invalidate both *Vergano's* clause and the one *Hornbeck* said it would uphold. Instead, *Alack* cited *Vergano* and *Hornbeck* with approval and used them to illustrate how Missouri handles exculpatory clauses.

### Lewis and Warren

Although *Alack* is the principal case, we will briefly address *Lewis, Warren,* and the parties' overbroad readings of each.

*Lewis* is somewhat unusual, in that the court declined to consider whether the exculpatory language operated as a release, since the defendant ski resort never pleaded that defense. 6 S.W.3d at 396. The court instead considered the clause in connection with an assumption of risk defense. The resort's ski rental form—in a part not quoted in the opinion—apparently mentioned snow but not ice. *Id.* at 393. The court ruled this precluded only snow-based liability. Ice-based liability would be barred only if the clause's general reference to "negligence" was sufficient to do so. *Id.* Since the "negligence" reference also expressly purported to release claims based on any other legal theory, the court cited *Alack's* latent ambiguity discussion and said an ambiguity arose. *Id.* at 394. The court also measured the exculpatory language and its format by *Alack's* bottom-line holding and concluded the resort "did not effectively notify [the plaintiffs] that they were releasing [the resort] from claims arising from its negligence." *Compare* 6 S.W.3d at 394 *with Alack,* 923 S.W.2d at 337. This was because the "Rental Form," so titled in large type, did not say or indicate it was a release. 6 S.W.3d at 394—95. The plaintiffs had to sign it, while standing in line, to get their ski equipment. They felt pressured to move along without an adequate chance to read the form and comprehend it. *Id.* at 391, 395. In contrast to the large-type "Rental Form" title, the exculpatory clause at the bottom was in approximately five-point type (*Id.*), which we illustrate by reducing the *Lewis* clause accordingly:

> 10. I hereby release from any legal liability the ski area and its owners, agents and employees, as well as the manufacturers and distributors of this equipment from any and all liability for damage and injury or death to myself or to any person or property resulting from the selection, installation, maintenance, adjustment or use of this equipment and for any claim based upon negligence, breach of warranty, contract or other legal theory, accepting myself the full responsibility for any and all such damage, injury or death which may result.

Under these circumstances, the *Lewis* court deemed the exculpatory clause language and format neither unambiguous nor conspicuous, and thus insufficient under *Alack* to establish an express assumption of risk of ice defense. *Id.* at 395. We agree with this result, which is fully consistent with *Alack.* The *Lewis* clause mentioned "negligence" and arguably met *Alack's* bright-line rule. But five-point type is barely readable, let alone clear, conspicuous, unmistakable, or effective to notify ski renters they were releasing the resort from its own negligence. The ambiguity discussion was unnecessary to the holding, and *Lewis* does not say a clause can satisfy *Alack's* future negligence requirements, yet automatically fail under plaintiff's Point I reasoning.

While plaintiff reads *Lewis* too broadly, defendants do likewise with *Warren.*

Judge Robertson persuasively argued for that clause's ultimate validity (950 S.W.2d at 847—48), but the principal opinion did not go that far. It upheld the clause preliminarily, but remanded to allow the plaintiff to plead and prove any avoidance under *Alack*, which was decided· while *Warren* was on appeal. *Id.* at 846. Our supreme court arguably approved *Warren's* release, but only *prima facie*, subject to and without resolving challenges of the sort plaintiff makes here.

## Analysis

Our analysis yields two conclusions relevant to Plaintiff's Point I. First, *Alack's* analysis culminates in its essential holding that "exculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence." 923 S.W.2d at 337. *Alack's* bright-line rule is but a means to this end, as is its call for "clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence." *Id.* This explains how a clause that met *Alack's* bright-line rule could be struck down in *Lewis*. It explains why *Warren* remanded its clause, which met the bright-line rule but was never tested against *Alack's* essential holding. It ex-

plains why *Vergano* upheld a clause that arguably had a latent ambiguity about non-releasable claims, but met *Alack's* rules for future negligence releases. It also explains why *Alack* cited *Vergano* with approval. Notwithstanding any other latent ambiguities, *Vergano's* clause effectively notified the plaintiff she was releasing the defendant's negligence, and thus anticipated and complied with *Alack's* bottom-line holding.[6]

Second, even if there were two latent ambiguities, *Alack's* "fix" (use "negligence," etc.) and rationale (to alert all that future negligence is released) was limited to the negligence ambiguity since the case involved only negligence claims. So remedied, the clause would meet *Alack's* bottom-line test: Does the clause effectively notify one party that it is releasing the other party's negligence?

Plaintiff has not convinced us of a second bright-line rule akin to Point I and our second hypothetical conversation above. Paragraph 27 met *Alack's* bright-line rule. Its release clearly, unambiguously, unmistakably, and conspicuously applied "even if the cause or damages or injuries are alleged to be the *fault* or caused by the *negligence* or *carelessness* of the Lessor" (emphasis ours). It effectively notified

6. Indeed, *Alack's* approval of *Vergano,* and the supreme court's *prima facie* approval of *Warren's* clause one year after *Alack,* may lend credence to the *Alack* dissenters' contention that the majority's "latent ambiguity" discussion was:

not talking about an ambiguity at· all. The general rule of law that courts will properly refuse to give effect to exculpatory clauses for intentional torts is not a rule governing interpretation and construction. It is part of the substantive law of contracts. "[A] rule of law which forbids effect being given to that [clear] meaning is part of the substantive law of contracts which comes into play after interpretation and construction have finished their work." 4 *Williston on*

*Contracts,* § 602 (3d ed.). Thus, courts refuse to enforce such exculpatory clauses not on the basis of ambiguity and not as a matter of contractual interpretation or construction, but as a matter of public policy. *Alack,* 923 S.W.2d at 345 (Robertson, J., dissenting). The dissenters believed no latent ambiguity was created "by the refusal of the substantive law to recognize exculpatory clauses purporting to relieve a party of liabili- ·ty for intentional torts." *Id.* at 346. "That the · contractual language under scrutiny might not exonerate Vic Tanny from willful torts does not create an ambiguity where the issue is whether the contractual language shields Vic Tanny from liability for its negligent acts." *Id.*

plaintiff she was releasing the Lessor from claims arising from its negligence, and thus met *Alack's* bottom-line standard as well. Point I fails.[7]

### Point II—Paragraph 27's Scope

Plaintiff's Point II notes that Paragraph 27 releases only the "Lessor." She claims McCormack is neither the "Lessor" nor a third party beneficiary of the lease, and thus cannot claim the clause's protection. We consider McCormack's three counter-arguments out of order.

#### Can McCormack enforce the clause as a party?

 McCormack claims it is the (or at least a) Lessor; thus a party to the lease; and in turn entitled to Paragraph 27's protection. However, the lease is ambiguous about who the "Lessor" is. Paragraph 1 of the lease describes the parties as:

> McCormack Baron Ragan Management Services, Inc. as agent for *Chesterfield Village Apartments* hereinafter referred to
>
> (Property Name)
>
> as "Lessor" whose address is *2310 W. Chesterfield Blvd.* and *Deanna Milligan,* who is (are) jointly and severally responsible under this Lease, hereinafter referred to as "Lessee."

Paragraph 2 ties the leased premises to paragraph 1's address for "Chesterfield Village Apartments" and "Lessor." We think the best interpretation has Chesterfield as Lessor, and McCormack acting as agent for a disclosed principal and thus not itself a party to the lease. It is fundamental that an agent signing a contract on behalf of a disclosed principal binds only the principal but not the agent itself, absent clear and explicit evidence that the agent also intended to be bound. *See, e.g., Professional Laundry Management Systems, Inc. v. Aquatic Technologies, Inc.,* 109 S.W.3d 200, 204—05 (Mo.App.2003); *Warren Supply Co. v. Lyle's Plumbing, L.L.C.,* 74 S.W.3d 816, 819 (Mo.App.2002); *Wallace, Saunders,* 963 S.W.2d at 422; *Budget Rent A Car of St. Louis v. Guaranty Nat. Ins. Co.,* 939 S.W.2d 412, 415 (Mo.App.1996); *21 West, Inc. v. Meadowgreen Trails, Inc.,* 913 S.W.2d 858, 882 (Mo.App.1995); *Golf Digest/Tennis, Inc. v. Diode, Inc.,* 849 S.W.2d 617, 618, 619 (Mo.App.1993). *See also* RESTATEMENT OF AGENCY (THIRD) § 6.01 (2005). In turn, an agent not individually burdened by a contract generally cannot claim individual benefits thereunder, absent proof the contacting parties so intended. *Id.* at Comment d.

 The lease evinces no intent to bind or benefit McCormack as a contracting party. To the contrary, Paragraph 1 expressly identifies McCormack as "agent" for the disclosed principal Chesterfield. Paragraph 1 also uses "jointly and severally" with the singular term "Lessee" to

---

7. That said, even *Alack's* dissenters expressed strong personal and policy concerns with exculpatory clauses in a health club contract. 923 S.W.2d at 339—40 (Limbaugh, J., dissenting), at 342 (Robertson, J., dissenting and joined by Covington, J.). There are yet stronger reservations as to residential leases, especially adhesion leases of low-income housing. Mr. Alack, if unwilling to give up his legal rights against Vic Tanny, might have joined a different health club or the local Y, bought his own exercise equipment, or simply forgone his exercise plans. Thus, freedom of contract outweighed the public policy disfavoring a health club's exculpatory clause. *Id.* A low-income family cannot forgo housing, yet may be unable to buy a home, have few rental options, and lack any power to bargain away onerous lease terms. As more low-income lessors add exculpatory clauses to their lease forms, low-income lessees' "freedom of contract" may become increasingly illusory.

accommodate multiple persons, but eschews comparable language for its singular term "Lessor." Paragraph 25 does not mention "agents" as persons to be bound and benefited by the agreement. Paragraph 27's exculpatory language easily could have included "and agents," but it does not. The lease language does not indicate the agent McCormack is individually obligated. If not, McCormack cannot claim lease benefits unless it is a third-party beneficiary, a claim McCormack has not made. To be a third-party beneficiary, the contact must clearly express intent to benefit that party or an identifiable class to which the party belongs. Absent express declaration of such intent, it is strongly presumed that the third party is not a beneficiary and the parties contracted only to benefit themselves. *Nitro Distributing, Inc. v. Dunn,* 194 S.W.3d 339, 345 (Mo. banc 2006).

### Is McCormack released by operation of law?

Next, McCormack argues release of a master also releases its servant, citing *Max v. Spaeth,* 349 S.W.2d 1, 3 (Mo.1961). This is no master-servant or respondeat superior case, as *Max* was. *Id. Max's* release also was given to the servant, not the master. *Id.* Thus, McCormack is citing *dicta,* and *dicta* questioned by our supreme court at that. *Aherron v. St. John's Mercy Medical Center,* 713 S.W.2d 498, 500—01 (Mo.1986).[8] Our courts have questioned *Max's* correctness and vitality, especially in light of RSMo § 537.060, a statute defendants pleaded in their answers. *See Aherron,* 713 S.W.2d at 500—01; *Manar v. Park Lane Medical Center,* 753 S.W.2d 310, 312—14 (Mo.App.1988); *Glidewell v. S.C. Management, Inc.,* 923

S:W.2d 940, 944—46 (Mo.App.1996). Indeed, this court has concluded *Aherron's* broad language "abrogates the common law rules mentioned in *Max.*" *Id.* at 946.

### Did plaintiff admit herself out of a claim against McCormack?

McCormack claims plaintiff cannot deny Paragraph 27 protects McCormack because she admitted entering the lease with defendants. We consider this a *non sequitur.* Uncontroverted fact No. 1 in defendants' summary judgment motion asserted that plaintiff entered a lease agreement with defendants and a copy of the lease was attached. Rule 74.04(c)(2) required plaintiff to "admit or deny each of movant's factual statements," and plaintiff admitted the facts as to No. 1.

Yet plaintiff's factual response does not answer, and certainly does not bind this court in deciding, the *legal* question whether McCormack is a party to the lease, or the *legal* interpretation of Paragraph 27's scope. We illustrate by considering defendants' claim that the lease "is clearly and unambiguously an agreement between" plaintiff and McCormack, and "McCormack is therefore entitled to the benefit of the Waiver of Liability clause." The first half is correct. The lease *is* plaintiff's agreement with McCormack, who is acting as Chesterfield's agent, so it becomes plaintiff's agreement with Chesterfield. The rest of the statement is incorrect. Signing as an agent neither bound nor benefited McCormack individually.

 An agreement to release one person's tort liability discharges no other tort-feasor unless the agreement so provides. RSMo § 537.060. This "operates to preclude the unintended release of persons

---

**8.** *"Max v. Spaeth* ... includes dicta that 'release of the master releases the servant.' We need not determine whether that dicta correctly states the law in Missouri in cases involving vicarious liability." *Id.*

liable in tort." *Manar*, 753 S.W.2d at 313, *citing Aherron*, 713 S.W.2d at 501. Effective notice that one "is releasing *the other party* from claims arising from *the other party's* own negligence" imports "clear, unambiguous, unmistakable, and conspicuous" disclosure of not just *what* but *who* is released. *Alack*, 923 S.W.2d at 337 (emphasis added). Otherwise, § 537.060's principle of avoiding unintended releases is violated. We already noted how easily "and McCormack," "and agents," etc. could have been added to Paragraph 27. Courts do not imply exemptions from negligence (*Alack*, 923 S.W.2d at 334), especially in contracts, like this one, arguably of adhesion.

Point II is well taken. On this record, Paragraph 27 does not preclude plaintiff's claims against McCormack.

### Conclusion

We affirm the judgment for Chesterfield. We reverse the judgment for McCormack and remand those claims for proceedings consistent with this opinion.

PARRISH, J., Concurs.

RAHMEYER, P.J., Concurs in Part and Dissents in Part.

NANCY STEFFEN RAHMEYER, Presiding Judge, dissenting in part and concurring in part.

I respectfully dissent from the majority's opinion that Paragraph 27 is unambiguous, but concur in the majority's opinion that Paragraph 27 does not preclude Appellant's claims against McCormack. In light of *Lewis v. Snow Creek, Inc.*, 6 S.W.3d 388 (Mo.App. W.D.1999), I would find Paragraph 27 of the apartment lease to be ambiguous because its general language would include intentional torts and other causes of action which one may nev-

er use to exonerate oneself from future liability.

On October 6, 2004, while Deanna Milligan ("Appellant") was a tenant living on the second floor of an apartment building owned by Chesterfield Village GP, LLC, d/b/a Chesterfield Village Apartments, LP ("Respondent"), the building was destroyed by a fire and she was injured when she fell to the ground while trying to save herself and her two children by escaping her second-story apartment through a bedroom window. Appellant was forced out her window by the fire because, two days before, the breezeway between her apartment and the exit route became blocked with boxes and other materials from a new tenant. These boxes were not moved for the two days before the fire and completely blocked ingress and egress until the time of the fire. Appellant alleges that these boxes and other packing material not only blocked her escape route, but also that they contributed to the cause of the fire. The failure to unblock the breezeway was a violation of the City's fire code and the express policy of Respondent. The allegations of landlord's negligence are that the landlord failed to maintain a clear path of ingress and egress from Appellant's apartment, which contributed to the injuries Appellant incurred while trying to flee her burning apartment.

The majority opinion finds the exculpatory clause was not ambiguous based upon the "test" adopted by the Missouri Supreme Court in *Warren v. Paragon Technologies Group, Inc.*, 950 S.W.2d 844 (Mo. banc 1997), which held, in order to release a party from its own negligence, the language of the exculpatory clause must be " 'clear, unambiguous, unmistakable, and conspicuous.' " *Id.* at 845 (quoting *Alack v. Vic Tanny International of Missouri, Inc.*, 923 S.W.2d 330, 337 (Mo. banc 1996)). As discussed in the majority opinion, the

court in *Lewis* analyzed whether an exculpatory clause found in a ski rental form established an express assumption of risk.[1] The court found that the exculpatory clause in *Lewis* used "general language" which would include "intentional torts, gross negligence or any other cause of action not expressly listed." *Lewis*, 6 S.W.3d at 394. " '[T]here is no question that one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest.' " *Id.* (quoting *Alack*, 923 S.W.2d at 337). The court concluded that, based upon *Alack*, an exculpatory clause that " 'purports to relieve a party from any and all claims but does not actually do so is duplicitous, indistinct and uncertain.' " *Id.* (quoting *Alack*, 923 S.W.2d at 337). When there is "duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract" an ambiguity arises. *Rodriguez v. General Acc. Ins. Co. of America*, 808 S.W.2d 379, 382 (Mo. banc 1991). *Lewis*, "[i]n addition," found that the exculpatory clause in the ski rental form was not "conspicuous," as required by *Alack*, and therefore was invalid. *Lewis*, 6 S.W.3d at 394–95. The court then stated that the language of the exculpatory clause was "not 'unambiguous' or 'conspicuous,' and thus [did] not meet the standard of *Alack*." *Id.* at 395.

Based upon these two alternative holdings, the majority states that the "ambiguity discussion was unnecessary to the holding, and *Lewis* does not say a clause can satisfy *Alack's* future negligence requirements, yet automatically fail under plaintiff's Point I reasoning." In fact, that is exactly what *Lewis* stated. Its first holding is that the general language in the exculpatory clause, specifically, that it purports to exonerate future liability for "any claim" including a claim which one may never exonerate future liability for, makes it ambiguous. *Id.* at 394. The fact that its alternative second holding is that the exculpatory clause is also invalid because it was not conspicuous does not render its other holding meaningless.

When there are alternative holdings each is authoritative. *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949); *Holt v. State*, 494 S.W.2d 657, 659 (Mo.App.St.L.D.1973); *see also Jones v. Ladriere*, 108 S.W.3d 736, 739 n. 2 (Mo.App. E.D.2003); *Buatte v. Schnuck Markets, Inc.*, 98 S.W.3d 569, 574 n. 1 (Mo.App. E.D.2002); *City of St. Louis v. Riverside Waste Management, L.L.C.*, 73 S.W.3d 794, 806 n. 5 (Mo.App. E.D. 2002). The court in *Holt* stated:

> It is well settled that when a court bases its decision on two or more distinct grounds, each is as authoritative as the other and neither is obit[e]r dictum. This rule is the only reasonable inference to be drawn from alternative holdings. Unless all the alternatives are to be considered authoritative, how is one to pick which is the rule of law and which is dictum?

*Holt*, 494 S.W.2d at 659 (internal citations omitted).

Based upon *Lewis* and *Alack*, I would find the exculpatory clause in Paragraph 27 of the lease to be ambiguous as the release purports to absolve the landlord of all actions intended and unintended. We look to the lease contract principles to determine whether the contract is ambiguous. An ambiguity arises when, from the four corners of the contract alone, it ap-

---

1. This case is different from *Lewis* because here the issue is whether the exculpatory clause operated as a release of liability and in *Lewis* the issue was whether the exculpatory clause established an express assumption of risk; however, the analysis as to the validity of the exculpatory clause remains the same in each circumstance.

pears that " 'the terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms.' " *Eveland v. Eveland* 156 S.W.3d 366 (Mo.App. E.D.2004) (quoting *Chehval v. St. John's Mercy Medical Center*, 958 S.W.2d 36, 38 (Mo.App. E.D.1997)). Moreover, we look only to the language in the provision to determine if it is ambiguous. *Little v. American States Ins. Co.*, 179 S.W.3d 433, 439–41 (Mo.App. S.D.2005) (where the court found a contract provision to be ambiguous because its meaning could not be determined within the boundaries of the contract). Here, the provision in question is a waiver of liability that states:

27. WAIVER OF LIABILITY

Lessee hereby agrees that Lessor shall not be liable to Lessee, his family, guests, invitees, servants, or others[2] for injury to or death of any person or pet, nor for loss or damage to property (including the property of Lessee) occurring in or about the Leased Premises from any cause whatsoever, even if the cause or damages or injuries are alleged to be the fault or caused by the negligence or carelessness of the Lessor.

As a reviewing court, this Court must determine, solely from the four corners of the contract, whether this provision is susceptible to more than one meaning, and is therefore ambiguous. *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007). In making that determination, we apply the meaning which would be attached to those terms by an ordinary person of average understanding. *McCormack Baron Mgmt. Serv., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 171 (Mo. banc 1999). The plain meaning

of the terms "any cause whatsoever" could include not only "negligence," as listed, but also intentional torts and matters involving the public interest, which are decidedly non-releasable liabilities. Therefore, the provisions are susceptible to more than one meaning and they are ambiguous.

Through hypothetical, the majority opinion illustrates its view that the exculpatory provision cannot be ambiguous because Appellant's only claim is that of negligence and there is no ambiguity with regards to negligence. What the majority fails to accomplish, however, is a proper review of this contract's construction. As previously stated, the terms of a contract are reviewed first, within the four corners for ambiguities. Then, where, as here, ambiguities are present, the court should look outside the contract to determine a parties intent. Instead, the majority begins outside the contract with Appellant's negligence claim and works backward.

This case clearly illustrates the fact that if you start at the end you will, of course, be able to identify one clear meaning; however, a proper review of contract construction is meant to start at the beginning and make sure there is only one path to the end result. Interpreting this contract from beginning to end reveals that the "waiver of liability" provision is subject to more than one meaning and is therefore ambiguous.

The *Warren* court adopted the ambiguity test directly from *Alack*, which dealt with an exculpatory clause in a health club membership. The *Alack* court was presented with the question of whether or not the specific exculpatory clause in question was ambiguous. *Alack*, 923 S.W.2d at 332. The *Warren* court, citing *Alack*, found that

---

2. The grossly overbroad scope of this waiver is apparent from its attempt to exclude liability to "family, guests, invitees, servants, or others" via a contract to which they are not parties and, in all likelihood, is unknown to them.

exculpatory clauses in private contracts are not void as against public policy, but did not review the public policy implications as applied to a residential lease. *Warren*, 950 S.W.2d at 845. The affirmance was without any discussion of the different policy concerns that absolutely exist between a residential lease and a health club membership. Instead, an analysis designed to test exculpatory clauses in private contracts was applied to a different kind of contract with no further inquiry into the public policy issues that clearly exist in these two very different situations, although the *Warren* court did note that release of future negligence is disfavored and should be strictly construed. *Id.* The majority opinion of this Court makes the same inquiry and observes obvious policy implications of allowing exculpatory clauses in residential leases. The present case is an appropriate case to revisit the policy implications of allowing landlords to shirk their responsibility to act in a responsible and non-negligent manner towards tenants.

Covenants that relieve parties of future negligence are not void per se as against public policy, yet this rule does not apply in cases involving gross negligence, fraud, unequal bargaining power, or a public interest. *Kansas City Stock Yards Co. v. A. Reich & Sons*, 250 S.W.2d 692, 698 (Mo. 1952) (*overruled in part on other grounds by Gateway Chemical Co. v. Groves*, 338 S.W.2d 83, 87 (Mo.1960)) (upholding an exculpatory clause in a commercial lease where the landlord accepted lower rent in exchange for the tenant's release of the landlord from any liability). Therefore, if the contract does not involve the public, but rather private parties, then no public interest exists, and no public policy can be violated. *Id.; see also Rock Springs Realty, Inc. v. Waid*, 392 S.W.2d 270, 272 (Mo. 1965). Neither this Court, nor the *Warren* court, however, considered whether a residential lease in fact involves a public or a private interest.

Missouri courts have chosen to review the validity of exculpatory clauses through a strict review of the language involved. As mentioned previously, the intention to release one from his or her negligent acts must be clearly expressed in plain terms that are "clear, unambiguous, unmistakable, and conspicuous." Even more specifically, the Missouri Supreme Court chose to require the words "negligence," "fault," or an equivalent to be used in the exculpatory clause. A different approach has come from those states which have recognized that the use of exculpatory clauses necessarily challenges the principles of freedom to contract and common law requirements that a person be accountable for their own bad acts. *See e.g. Stanley v. Creighton Co.*, 911 P.2d 705, 706 (Colo. App.1996).

Specifically, alternative approaches include considerations of whether the contract involves a public interest, whether the contract was entered into fairly, the relative bargaining power of the parties, the practical necessity of the item contracted for, whether the transaction causes one party to be under the control of the party making him vulnerable to his carelessness, whether there is legislative policy against it, and whether a significant number of people are forced to use the service. *See generally Id.* (considering whether the subject matter concerned a type of duty affecting the public interest and the circumstances of the specific contract, the court held that the exculpatory clause in a residential lease was void on grounds of public policy); *Lloyd v. Service Corp. of Alabama, Inc.*, 453 So.2d 735, 738 (Ala. 1984) (declined to follow by *Warren*, 950 S.W.2d at 845) (using a five-part test to determine the public policy issue, which included: (1) whether the service provided

by the contract is of public necessity; (2) whether a significant number of people are forced to use the service; (3) whether the transaction places one party under the control of the other and makes him vulnerable to the other's carelessness; (4) whether the bargaining power of the parties is equal; and (5) whether there is a legislative policy against unconscionable contracts); *Crawford v. Buckner*, 839 S.W.2d 754, 757 (Tenn.1992) (applying a six-part test stating, " '[i]t is not necessary that all be present in any given transaction, but generally a transaction that has some of these characteristics would be offensive' ": (1) whether the contract concerns a business suitable for public regulation; (2) whether the service provided is of public importance and public necessity; (3) whether the party holds himself out to provide this service for anyone who seeks it, or who meets established standards; (4) whether the party invoking exculpation has more bargaining power because of the nature of the service provided; (5) whether, because of superior bargaining power, the party presents the public with a standardized adhesion contract and makes no provision allowing the public to obtain protection against negligence; and (6) whether the person or property is placed under the control of the seller, subject to risk of carelessness by the seller) (quoting *Olson v. Molzen*, 558 S.W.2d 429 (Tenn.1977)); *Garretson v. United States*, 456 F.2d 1017, 1020–21 (9th Cir.1972) (upholding an exculpatory clause because the service rendered was not essential to the public welfare or convenience); *Boucher v. Riner*, 68 Md. App. 539, 514 A.2d 485, 491 (Md.Ct. Spec.App.1986) (upholding an exculpatory clause because parachute lessons are not of practical necessity).

While many other approaches exist, it is possible to reassess this topic within the confines of established Missouri law. Here, the basis for allowing the use of exculpatory clauses in residential leases stems from the idea that residential leases are essentially private contracts; however, it is unrealistic to ignore the present day realities of the landlord-tenant relationship. There is rarely a negotiation in a private residential lease where bargains and concessions occur until an agreement is reached. A tenant does not negotiate to pay more and bargain for extra protection from his landlord's negligence. *See Crawford*, 839 S.W.2d at 758 (noting that the average tenant is faced with a "take it or leave it" contract). Commonly, the lease contains boilerplate language and will now contain additional language releasing the landlord from any responsibility to act in a prudent careful manner.

We no longer live in an era of the occasional rental of rooms in a private home or over the corner grocery. In the relatively short span of 30 years the public's use of rental units in this state has expanded dramatically. In the past 10 years alone, in the state of Washington, there has been an increase of over 77,000 rental units. It takes no imagination to see that a business which once had a minor impact upon the living habits of the citizenry has developed into a major commercial enterprise directly touching the lives of hundreds of thousands of people who depend upon it for shelter.

Thus, we are not faced merely with the theoretical duty of construing a provision in an isolated contract specifically bargained for by [o]ne landlord and one tenant as a purely private affair[ ]. Considered realistically, we are asked to construe an exculpatory clause, the generalized use of which may have an impact upon thousands of potential tenants.

*McCutcheon v. United Homes Corp.*, 79 Wash.2d 443, 486 P.2d 1093, 1097 (Wash. 1971).

It takes no imagination to see that, when a tenant signs a lease, he has become vulnerable to the carelessness of the landlord, the person who is literally charged with the protection of the roof over a tenant's head. By allowing exculpatory clauses to save landlords from responsibility from their own negligence, we are putting tenants at risk. *See Lewis v. Biegel,* 204 S.W.3d 354, 357–58 (Mo.App. W.D. 2006) (where tenant alleges that landlord is negligent in repairing an elevator because landlord has no mechanical expertise and his incomplete repair of the brake system caused the elevator to fall on two separate occasions while tenant was inside); *Shannon v. Welch,* 858 S.W.2d 748, 751–53 (Mo.App. W.D.1993) (affirming an award of damages to a mobile home tenant for losses resulting from fire, which landlord caused by negligent repair of a water heater); *Kilmer v. Browning,* 806 S.W.2d 75, 79–80 (Mo.App. S.D.1991)(holding that landlord was negligent where a 20–year-old man died from carbon monoxide poisoning and evidence was overwhelming that the condition which caused the death was the collapse of the venting system that was under the control of the landlord); *Norwood v. Lazarus,* 634 S.W.2d 584, 587–88 (Mo.App. E.D.1982) (holding that landlord was liable for negligence where tenant's child was injured when he ingested lead-based paint on landlords' premises); *Stoeppelman v. Hays–Fendler Const. Co.,* 437 S.W.2d 143, 148 (Mo.App.St.L.D.1968) (holding that landlord was negligent where tenant was injured leaving the premises and fell into a trench left open during a period of construction, with no warnings, extra lighting, barriers, or prior notice of the danger); *Taylor v. Hitt,* 342 S.W.2d 489, 495–96 (Mo.App.St.L.D.1961) (holding landlord was negligent in allowing existence of a 15–inch square depression in area of basement which landlord knew was to be used by several tenants for washing clothes and that negligence was the proximate cause of injury sustained by a tenant when she fell near such depression.); *Harrison v. Roberts,* 800 S.W.2d 40, 44 (Mo. App. W.D.1990) (holding landlord negligent where the dangerous and defective condition of one part of the porch gave rise to a duty to inspect the rest of the porch, and tenant was injured when railing on porch gave way and tenant fell). According to the United States Census Bureau, in 2006, of the 2,285,280 occupied housing units in the state of Missouri, 671,063, or 29.36% are renter occupied. This accounts for 1,467,592 people that are living in rental units and are affected by the potential carelessness and negligence of their landlords.

Before this Court relieves landlords of their long-held obligation to use reasonable care, a meaningful review of the various policy considerations should be taken. Currently, landlords are protected from liability to tenants for dangerous conditions existing on leased premises, with exceptions, from liability for personal injury to third persons occurring on leased property. There are at least four exceptions to the general rule:

> (1) where the landlord had superior knowledge of a dangerous condition not discoverable by his tenant and he fails to warn of said condition; (2) where the injury occurs in an area over which the landlord retains actual control; (3) where the landlord is responsible for premises maintenance and repair or (4) where the landlord leases for a "public use" premises that are in a dangerous condition.

*Lammert v. Lesco Auto Sales,* 936 S.W.2d 846, 849 (Mo.App. E.D.1996). These four exceptions can be viewed as the four protections that tenants can count on; however, the application of the exculpatory

clause effectively obliterates this minimum protection.

"[T]here is no question that one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest." *Alack*, 923 S.W.2d at 337. There is public interest in the protection of thousands of residential tenants across the State of Missouri, and the protection of the established common law of landlord-tenant law. Moreover, there is public interest in protecting the freedom to contract in a setting that provides for equal bargaining powers and the power to bargain for and protect ones personal rights and interests. The state has recognized a basic need for landlords to act in a reasonable manner by creating regulations and ordinances designed to maintain a minimum safety level. Here, there was a city ordinance, which landlord was alleged to have violated, that required the landlord to maintain a clear ingress and egress. The landlord's failure to comply with this ordinance would require him to pay a fine to the city as punishment. Yet, as a result of the majority opinion, while the city will recover for the landlord's misbehavior, the injured tenant will be left without recourse. Moreover, how can a contract provision in conflict with established law not be considered contrary to public policy? Given the obvious public policy implications of the residential lease, I would agree that one may never exonerate themselves from activities involving the public interest and that the residential leasing market is such a public interest; therefore, the exculpatory clause in the residential lease should be found void.