**Thomas ABBOTT, Personal Represen-
tative of the Estate of Charles
Abbott, Appellant,**

v.

**EPIC LANDSCAPE PRODUCTIONS,
L.C., et al., Respondents.**

**No. WD 72867.**

Missouri Court of Appeals,
Western District.

Sept. 20, 2011.

As Modified Jan. 31, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 31, 2012.

Application for Transfer Denied
April 3, 2012.

Richard J. Zalasky, St. Louis, MO, for appellant.

Paul Christian Hamill, St. Louis, MO, and Joseph Jay Roper and John Michael Brigg, Kansas City, MO, for respondents.

Before Division Two: James M. Smart, Jr., P.J., Mark D. Pfeiffer and Cynthia L. Martin, JJ.

JAMES M. SMART, JR., Judge.

Charles Abbott appeals the judgment of the trial court granting Fountainhead Refunding, L.L.C.'s ("Fountainhead's") Motion to Dismiss and Epic Landscaping Productions, L.C.'s ("Epic's") Motion for Summary Judgment. Abbott contends that the trial court erred in granting Fountainhead's Motion based on a clause in the lease Abbott signed, because Fountainhead was not a party to the lease. Abbott also contends the clause is void as against public policy. Abbott further contends that genuine issues of material fact exist regarding whether Epic owed him a duty of reasonable care when removing snow from the apartment complex parking lot. We affirm in part, and reverse in part.[1]

### Statement of Facts

On January 23, 2007, Appellant Charles Abbott fell on an icy patch in the parking lot of the Fountainhead apartment complex located in Kansas City, Missouri. As a result of the fall, he suffered injuries to his leg, which eventually led to his leg being amputated.

Abbott was a resident at the apartment complex pursuant to a lease that he had signed on June 30, 2006. The lease identi-

1. After opinion hand down, Thomas Abbott, as personal representative of the estate of Charles Abbott, was substituted for Charles Abbott, who passed away after trial.

fied the parties to the agreement as "Fountainhead Acquisition Corp. D.B.A. Fountainhead Apartments," designated as the landlord, and Charles Abbott, designated as the tenant. Maxus Properties, Inc. ("Maxus Properties") is identified as the agent for the landlord who is authorized to manage the Fountainhead complex premises. The lease also included an exculpatory clause releasing the landlord and its agents from any liability due to its negligence.

While "Fountainhead Acquisition Corp." was listed as the landlord on the lease, it was not, in fact, the landlord of the apartment complex at the time the lease was signed by Abbott. On January 1, 2001, Respondent Fountainhead (Fountainhead Refunding, L.L.C.) acquired the apartment complex from Fountainhead Acquisition Corp. ("Acquisition"), the previous owner. At the time that Abbott signed the lease, Acquisition no longer had any interest in the apartment complex. Instead, Fountainhead was the true owner. The misnomer was the result of Maxus Properties' failure to update the standard form lease language after the apartment complex was purchased by Fountainhead.

Respondent Epic entered into an oral contract with Fountainhead to provide snow maintenance services at the apartment complex in January of 2007. The contract required Epic to treat, without Fountainhead's prior approval, the parking lot at the complex upon the "trigger event" of snow accumulation of two inches or more. On this "trigger event," Epic was to push the snow from the drive lanes and parking stalls of the complex parking lots and then treat the same area with salt. Epic and Abbott dispute whether the contract with Fountainhead required Epic to put down *both* "Ice Melt"[2] *and* salt or only salt. Epic did *not* contract to physically remove the accumulated snow from the premises. Any other snow maintenance performed by Epic, outside a "trigger event" of an accumulation of two inches or more of snowfall, required the prior authorization of Fountainhead.

On January 20, 2007, the Kansas City area experienced fog, freezing fog, haze, and a snowfall of greater than two inches. This triggered the snow maintenance services of Epic at the apartment complex on January 21, 2007. Fountainhead paid Epic's invoice for its work on January 21st. No other "trigger" events occurred between the time Epic last performed its services at the apartment complex and the time that Abbott fell on January 23rd. Fountainhead never requested any additional services within this time frame.

On December 5, 2008, Abbott filed suit in Jackson County Circuit Court against Maxus Realty Trust, Inc. ("Maxus Realty") and Epic. After Maxus Realty demonstrated that it did not own the apartment complex, Abbott dismissed Maxus Realty and sought leave to add Fountainhead as a defendant, which was granted. Fountainhead filed a motion to dismiss on July 2, 2009, based on the exculpatory language included in the lease Abbott signed. In April 2010, Epic filed a motion for summary judgment against Abbott asserting that it did not owe a duty of care to Abbott on the date of his fall. The trial court granted both motions pursuant to *nunc pro tunc* judgments on September 1, 2010. Abbott appeals the grant of Fountainhead's Motion to Dismiss and Epic's Motion for Summary Judgment.

---

**2.** Neither side defines "Ice Melt." We will assume the parties here are referring to a solid, crystal-like compound for melting ice, similar to salt, and made up of *any* different chemical than salt (sodium chloride).

## Abbott's Contentions as to Fountainhead

Abbott's first three points on appeal address issues concerning the granting of Fountainhead's Motion to Dismiss. Fountainhead contends that Abbott's three points on appeal raise issues never originally presented to the trial court when it considered Fountainhead's Motion to Dismiss and are therefore subject only to plain error review. Abbott conceded that plain error review was appropriate for his three points both in his reply brief and at oral argument, and he asks for plain error review.[3] We will consider his contentions at face value to see if they assert plain, obvious error affecting substantial rights.

■ In Abbott's first point, he argues that the trial court erred in granting Fountainhead's Motion to Dismiss because Acquisition lacked the capacity to contract, which rendered the lease unenforceable, meaning Fountainhead could not rely on the lease's exculpatory clause. Abbott further contends, in his second Point Relied On, that Fountainhead is unable to enforce the exculpatory clause contained in the lease because Acquisition was named in the lease as the landlord and only parties to a written contract, or in privity thereto, may enforce it. According to Abbott,

Fountainhead was not a party to the lease and therefore lacks standing to enforce it.

■ Abbott argues that no lease existed in the first place, either 1) because Acquisition lacked the capacity to contract, or 2) because Fountainhead cannot enforce the exculpatory clause of the lease because Acquisition was named as the landlord. Abbott, however, judicially admitted in the trial court that he had entered into the lease with Fountainhead. "[A] judicial admission requires a specifically pled allegation by one party that is admitted by the other party." *M & I Marshall & Ilsley Bank v. Sader & Garvin, L.L.C.*, 318 S.W.3d 772, 778 (Mo.App.2010). Here, both the amended petition and the response to the motion to dismiss recited that Abbott entered into the lease with Fountainhead. Thus, we discern no plain, obvious error of the trial court in regarding the exculpatory clause to be part of a contract between Abbott and Fountainhead.

■ Abbott also contends that the exculpatory clause was "obviously invalid" on its face because "one may never ... exonerate oneself from future liability for activities that involve the public interest," such as residential leases. Therefore, he says,

---

3. Abbott initially contended that because Fountainhead had attached two exhibits to its motion to dismiss, which were not a part of its pleading, the court should treat this as a motion for summary judgment instead of a motion to dismiss pursuant to Rule 55.27(a). Rule 55.27(a) provides that when matters outside the pleadings are presented to and not excluded by the court, the motion to dismiss shall be treated as one for summary judgment. *See Crede v. City of Oak Grove*, 979 S.W.2d 529, 532 (Mo.App.1998). However, a "[t]rial court's order will constitute a dismissal, and not a summary judgment, where the record contains no evidence that the court notified the parties that it intended to review pleadings and documents as a summary judg-

ment motion, nor that the court considered matters outside the pleadings." *Turner Eng'g, Inc. v. 149/155 Weldon Parkway, Inc.*, 40 S.W.3d 406, 409 (Mo.App.2001). Here, the court did not have to consider any information outside of Abbott's First Amended Petition or Fountainhead's Motion. There was no dispute as to the facts. Abbott admitted that it had entered into the lease agreement with Fountainhead. The record does not support Abbott's contention that the trial court treated the motion to dismiss as a motion for summary judgment and we shall not address it in such a manner. In any event, the result would be the same either way because it is approached strictly as an issue of law.

the court plainly erred in enforcing the clause.

 "Public policy disfavors but *does not* prohibit releases of future negligence." *Milligan v. Chesterfield Vill. GP, L.L.C.*, 239 S.W.3d 613, 616 (Mo.App.2007) (citing *Warren v. Paragon Techs. Grp.*, 950 S.W.2d 844, 845 (Mo. banc 1997); *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 334 (Mo. banc 1996)). The Missouri Supreme Court addressed the enforceability of such clauses in *Alack v. Vic Tanny International of Missouri, Inc.*, 923 S.W.2d at 337. In that case, the Court announced that in order to be enforceable in Missouri, exculpatory clauses require "clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence. The exculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence." *Id.*

 The *Alack* Court noted that a key factor in any exculpatory clause would be the words "negligence" or "fault." "The words 'negligence' or 'fault' or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs. There must be no doubt that a reasonable person agreeing to an exculpatory clause actually understands what future claims he or she is waiving." *Id.* at 337–38. A term or clause is "conspicuous" if it is "clearly visible or obvious." Black's Law Dictionary 351 (9th ed.2009). "Whether a printed clause is conspicuous as a matter of law usually depends on the size and style of the typeface." *Id.*

The exculpatory clause contained in the lease signed by Abbott,[4] printed in all capital letters, reads, in pertinent part, as follows:

44. **EXCULPATION, TENANT'S RELEASE AND AGREEMENT TO INDEMNIFY.** LANDLORD AND ITS AGENTS ARE NOT LIABLE FOR PERSONAL INJURY OR FOR DAMAGE TO OR LOSS OF PERSONAL PROPERTY IN OR ABOUT THE PREMISES, REGARDLESS OF THE CAUSE OF SUCH INJURY, LOSS OR DAMAGE, INCLUDING BUT NOT LIMITED TO INTERRUPTION OF UTILITIES OR OTHER CASUALTY OR OCCURRENCES. TENANT, FOR HIMSELF, HIS HEIRS, EXECUTORS, ADMINISTRATORS, APPROVED SUCCESSORS AND ASSIGNS, HEREBY RELEASES, RELINQUISHES AND DISCHARGES, AND AGREES TO INDEMNIFY, PROTECT AND SAVE HARMLESS LANDLORD, IT'S [sic] AGENTS, SUCCESSORS, AND ASSIGNS OF AND FROM ANY AND ALL CLAIMS, DEMANDS AND LIABILITY FOR ANY INJURY TO, INCLUDING DEATH OF, PERSONS (WHETHER THEY BE THIRD PERSONS, TENANT, OR EMPLOYEES OF THE PARTIES HERETO) AND ANY LOSS OF OR DAMAGE TO PROPERTY (WHETHER THE SAME BE THAT OF EITHER OF THE PARTIES HERETO OR OF THIRD PERSONS) CAUSED BY, GROWING OUT OF, OR HAPPENING IN CONNECTION WITH, TENANT'S USE AND OCCUPANCY OF THE PREMISES, FIXTURES, EQUIPMENT, APPLIANCES, FACILITIES, IM-

---

4. The lease agreement was signed on behalf of Abbott by his designated attorney in fact pursuant to a power of attorney. Abbott does not dispute that he agreed to enter into the lease.

PROVEMENTS OR COMMON AREAS LOCATED OR TO BE LOCATED THEREON, OR BY REASON OF ANY LIKE OR DIFFERENT CASUALTY. IN LIKE MANNER AND TO THE EXTENT SET FORTH IN THE PRECEDING SENTENCE, *TENANT AGREES TO EXONERATE AND SAVE HARMLESS LANDLORD,* ITS EMPLOYEES, AND AGENTS *FROM ANY AND ALL LIABILITY EVEN THOUGH THE CLAIM, OR LOSS OR CASUALTY IS ATTRIBUTABLE TO THE NEGLIGENCE OF THE LANDLORD* OR ITS EMPLOYEES OR AGENTS.

(Emphasis added.) No other provision of the forty-four paragraph lease uses all-capital letters. Throughout the remainder of the lease the only other all-capitalized words used are either headings or defined terms.

Here, the waiver of liability for the landlord's negligent acts is explicit and contained in a separate sentence within the exculpatory clause. The language is sufficiently set off from the surrounding material so as to draw attention to it, making it conspicuous when compared to the rest of the lease. The language releasing the landlord from his own negligence contains the term "negligence," is explicit in its wording, and is written in capitalized letters in a paragraph displayed more prominently than any other part of the lease.

The exculpatory clause in the lease Abbott signed uses what could reasonably be considered "clear, unambiguous, unmistakable, and conspicuous language" to release Fountainhead from its own future negligence. We discern no plain, obvious error in regarding the lease as presumptively enforceable. Abbott asserts no other basis upon which to assert that the trial court plainly erred in holding the clause enforceable. For the foregoing reasons, Abbott's

contentions as to trial court plain error with regard to Fountainhead are denied.

### Abbott's Contentions as to Epic

Abbott contends that the trial court erred in finding that Epic did not owe him a duty to exercise reasonable care and subsequently granting Epic's Motion for Summary Judgment. Specifically, Abbott argues that when Epic entered into a contract with Fountainhead that affected the safety of third persons, the tenants of the apartment complex, it had a duty to exercise reasonable care in the performance of that contract with respect to the tenants affected thereby.

### *Standard of Review*

This court's review on an appeal from summary judgment "is essentially *de novo.*" *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper only if the moving party establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Rule 74.04(c)(6). This court will review the record in the light most favorable to the party against whom judgment was entered and accords the non-movant the benefit of all reasonable inferences from the record. *ITT Commercial Fin. Corp.,* 854 S.W.2d at 376.

"[S]ummary judgment may be entered only when the party seeking it shows, by unassailable proof, that he is entitled to judgment as a matter of law. The proof submitted should leave no room for controversy and should show, affirmatively, that the other party would not be entitled to recover under any discernible circumstances." *Wright v. Wrehe,* 415 S.W.2d 781, 783 (Mo.1967) (citation omitted). "Therefore, where the trial court, in order to grant summary judgment, must overlook

material in the record that raises a genuine dispute as to the facts underlying the movant's right to judgment, summary judgment is *not* proper." *ITT Commercial Fin. Corp.*, 854 S.W.2d at 378 (emphasis added).

### *Analysis*

■ On appeal, Abbott contends that the trial court erred in finding Epic did not owe him a duty to exercise reasonable care and subsequently granting Epic's Motion for Summary Judgment. Specifically, Abbott argues that when Epic entered into a contract with Fountainhead that affected the safety of third persons, the tenants of the apartment complex, it had a duty to perform that contract for the benefit of the tenants affected thereby. Abbott contends that Epic owed him a duty in the performance of that contract, and that genuine issues of material fact exist as to Epic's performance of the contract.

■ Although a contract may not often be the source of a tort duty by one of the contract parties toward a third party, Missouri law recognizes an exception in situations involving the safety of other persons. *Westerhold v. Carroll*, 419 S.W.2d 73 (Mo. 1967); *Wolfmeyer v. Otis Elevator Co.*, 262 S.W.2d 18 (Mo.1953); *Lambert v. Jones*, 339 Mo. 677, 98 S.W.2d 752 (1936).

> That is, a party by entering into a contract may place himself in such a relation toward third persons as to impose upon him an obligation to act in such a way that the third persons will not be damaged. *Wolfmeyer v. Otis Elevator Co.*, 262 S.W.2d 18. In *Lambert v. Jones*, 339 Mo. 677, 98 S.W.2d 752, 758, it was stated that where one under contract with another assumes responsibility for property or instrumentalities and

agrees under his contract to do certain things in connection therewith which, if left undone, would likely injure third persons, there seems to be no good reason why [he] should not be held liable to third persons injured thereby for his failure to do that which he agreed to do, which he assumed responsibility for, and which was reasonably necessary to be done for their protection. . . . . A basic principle is that [m]ost duties, imposed by the law of torts, arise out of circumstances and are based on "foreseeability" or reasonable anticipation that harm or injury is a likely result of acts or omissions.

*Westerhold,* 419 S.W.2d at 80 (internal quotations omitted).

"The existence of a duty will turn on the terms of the contract and the circumstances.[5] The proper inquiry is simply whether [Epic] assumed a duty to exercise reasonable care to prevent foreseeable harm to [Abbott]." *L.A.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 263 (Mo. banc 2002). Because Epic contracted to handle snow removal and treat icy conditions in the parking lot of the complex where Abbott lived, Epic assumed the duty to exercise reasonable care to perform its duty under the contract. *See Westerhold,* 419 S.W.2d at 80. We need not decide in this appeal whether any tort duty arising from the snow removal contract in this situation may go beyond the specific duty created by the contract, as Abbott seems to want us to hold. This case does not involve a security guard at a shopping center. It involves a snow removal contract, as was the case in *Hellmann v. Droege's Super Market, Inc.*, 943 S.W.2d 655 (Mo.App.1997), in which the

---

**5.** Epic has not thus far asserted any defense based on the exculpatory clause or any other

provision of the lease.

court assumed that the contractor had no tort duty to third parties that exceeded the specific contractual duties. Here, the dispute is as to what the contract required and whether the contractual duties were performed. Thus, we observe that there is a dispute as to some material facts, even if we assume the contractor has no duty to the tenants beyond the specific terms of the contract.

The trial court granted summary judgment in favor of Epic on grounds that it owed no duty to Abbott based upon Epic's claims that it fulfilled its obligations under the contract with Fountainhead and that there were no other "trigger" events that required Epic to take any action under the contract after performing its initial work on January 21st through the time that Abbott fell on January 23rd. Citing *Hellmann, supra,* Epic argued, and the trial court held, that on the day of the injury it owed no duty to Abbott, as a matter of law, because Epic had no legal obligation to treat the parking lot on the day Abbott fell and it never assumed control of the parking lot.

In *Hellmann,* the plaintiff, a customer of Droege's Super Market, Inc., brought suit against Droege's and the snow removal contractor, Hillermann Nursery and Florist, Inc. ("Contractor"), for injuries she sustained when she slipped and fell on ice in Droege's parking lot. *Id.* at 657. Contractor provided snow removal services to Droege's pursuant to an oral agreement. *Id.* at 658. Contractor, on its own initiative, sent employees to service the Droege's parking lot after an initial snow. *Id.* The service entailed plowing and the application of calcium chloride. *Id.* Contractor also agreed to plow the lot a second time and reapply chemicals if Droege's requested further service. *Id.*

Contractor plowed and applied calcium chloride on Droege's lot after an initial storm on December 30 and again on December 31, 1990. *Id.* Contractor also plowed on January 2 and 3, 1991. *Id.* On January 4, 1991, the date of loss, there was no additional accumulation of snow or ice. *Id.* Droege's did not call Contractor to plow the lot that day. *Id.* Instead, one of Droege's employees applied more calcium chloride to the lot on January 4th, and used a shovel to try to chip the ice that covered a row of parking spaces. *Id.* The trial court granted a directed verdict in favor of both Droege's and Contractor, finding that neither owed a duty to the plaintiff. *Id.* The reviewing court reversed the directed verdict in favor of Droege's, but sustained the verdict in favor of Contractor, concluding that "no agreement or undertaking obligated [Contractor] to insure the safety of the parking lot on January 4, 1991." *Id.* at 660.

*Hellmann* is similar to this case in that both cases involve a claimant who fell on a day other than the day the contractor did the snow removal, with no trigger event in the meantime. The record at this point here, as in *Hellmann,* does not show that Epic assumed responsibility as a guarantor and inspector of the day-to-day safety of the parking lot, other than to the extent of the reasonable performance of its duty in under the contract.

*Hellmann* also is not entirely on point with this case. In *Hellmann,* the Contractor's proper performance of its contractual obligations with Droege's was never in question. Epic characterizes *Hellmann* this way in its brief, stating: "*Hellmann* held that a plaintiff did not have a case against a snow removal contractor *when the contract was not breached* and did not ensure the safety of the parking lot on the date of the fall." (Emphasis added.) Here, by contrast, Abbott argues, and presents some evidence, that the contract was breached in that Epic failed to provide

both Ice Melt and salt as required by contract. Though Epic presented evidence that it fulfilled its obligations under the contract, there is a dispute of material fact related to whether Epic breached the contract with Fountainhead and failed to exercise reasonable care in performing its work on January 21, 2007, resulting in Abbott's fall and injuries.

According to the testimony of Maxus Properties' Regional Manager Cheryl Marshall, the oral contract between Fountainhead and Epic required Epic to apply both Ice Melt and salt to the parking lot, in addition to plowing. There also was some dispute of material fact as to whether Epic did spread Ice Melt on the parking lot on January 21st. The record does not establish the extent to which it might have made a difference, from a proximate cause standpoint, whether both solutions were applied.

Here, as in *Hellmann*, there was no "trigger" event requiring snow removal on the day of Abbott's fall, but the parties disagree as to whether Epic properly performed under the contract when it did perform snow removal on the 21st. Because of the disputes between the parties about whether Epic's performance was in keeping with its duty under the contract, we cannot say as a matter of law that Epic is entitled to summary judgment. Based on the record before this court, there are genuine issues of material fact as to whether Epic properly performed the contractual duty and whether its work, or lack thereof, caused Abbott's damages.

Epic further contends that because Fountainhead signed and paid for the snow removal work performed by Epic, indicating that the work met contract specifications, Epic must be held to have fully performed under the contract. We disagree. While the fact that Fountainhead paid the invoice is some evidence that Fountainhead was content at that time with Epic's performance, payment of the invoice did not *ipso facto* constitute irrefutable evidence that Epic had properly carried out its contractual duty from the standpoint of both owner and tenants. *See, e.g., Wolfmeyer*, 262 S.W.2d at 22. For instance, if Epic had begun snow removal, and then had plowed all of the snow in front of the entrance and exit to the parking lot so as to massively block both entrance and exit, and then had sought and obtained payment from Fountainhead for its work, Epic would still have breached its duty under the contract, not only as to Fountainhead, but also as to the third-person tenants.

In viewing the record in the light most favorable to the non-movant, Abbott, we find that genuine issues of material fact exist such that Epic's Motion for Summary Judgment should have been denied. The judgment of the trial court as to Epic is therefore reversed, and the case is remanded.

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed as to the dismissal of Fountainhead. As to Epic, the judgment is reversed and the case is remanded for further proceedings.

All concur.