Lindsay **FULLER,** Plaintiff–Appellant,

v.

**TLC PROPERTY MANAGEMENT, LLC,** Defendant–Respondent.

No. SD 31931.

Missouri Court of Appeals, Southern District, En Banc.

June 7, 2013.

---

Kurt J. Larson, Larson Law Firm, Springfield, MO, Attorney for Appellant.

Rachel A. Riso, Daniel, Powell & Brewer, Springfield, Mo, Attorney for Respondent.

GARY W. LYNCH, J.

Lindsay Fuller brought a tort claim for personal injury against TLC Property Management, LLC ("TLC"). Her claim arose out of her slip and fall in the parking lot of Orchard Park Apartments, where she leased an apartment. Fuller alleged in her petition that "[a]t all times relevant hereto, Orchard Park Apartments was managed by [TLC]." In its answer, TLC admitted that it was the property manager as Fuller alleged and asserted an affirmative defense that the tort claim was con-

tractually barred by paragraph 17 of the Lease Agreement Fuller had signed.[1]

TLC filed a motion for summary judgment alleging, as its legal basis, that "the exculpatory clause in the Lease Agreement [Fuller] entered into is valid and enforceable. The exculpatory clause effectively notified [Fuller] that she was releasing [TLC] from its own negligence." Fuller filed her response to TLC's motion for summary judgment, which yielded the following uncontroverted facts:

1. Fuller entered into a Lease Agreement with Orchard Park Apartments, LLC, on May 22, 2010.

2. The term of the Lease Agreement was for thirteen (13) months commencing June 26, 2010, until July 29, 2011.

3. Fuller signed the Lease Agreement on May 22, 2010.

4. Fuller initialed after each numbered paragraph in the Lease Agreement.

5. Fuller initialed after paragraph 17 in the Lease Agreement.

6. Paragraph 17 of the Lease Agreement states:

Tenant(s) agrees that all owners, Landlord and property managers of the Premises, and all their agents, employees, servants, invitees, successors and assigns shall not be liable to Tenant(s) or their family members, guests, invitees, servants, or others for injury to or death of any person or pet, nor for loss of or damage to personal property occurring on or about the Premises from any cause whatsoever, even if said damages, injuries or deaths are alleged to be the fault of or caused or contributed to be caused by the negligence, carelessness or fault of any or all owners, Landlord or property managers of the Premises (regardless of who is designated as Landlord). Tenant hereby agrees to release, indemnify, save, defend and hold harmless, including payment of reasonable attorneys fees, court costs, expenses and expert witness fees, Landlord, all owners and property managers of the Premises from and against any and all lawsuits, liabilities, or claims for damages, personal injury, death or property damage made by Tenant(s) or any person on or near the Premises at the invitation or allowance of Tenant(s) arising from Tenant's use of Premises, or from any activity, work or thing done, permitted or suffered by Tenant(s) on or about the Premises, even if such person injury, death or property damages are alleged to be caused or contributed to be caused by the fault of Landlord, property owner or manager. If Landlord furnishes smoke detectors it shall test same and provide initial batteries at Lease commencement, and thereafter Tenant shall pay for and replace smoke detector batteries, if any, as needed.

7. Fuller slipped and fell on ice in a parking lot at Orchard Park Apartments on February 7, 2011.

8. Fuller was a resident of Orchard Park Apartments on February 7, 2011.

9. As a result of Fuller's fall, she injured her left ankle.

Fuller filed suggestions in opposition to TLC's motion for summary judgment arguing that "the purported exculpatory language set forth in [TLC's] *Lease Agreement* fails to meet the stringent standard set forth in *Alack* [2]" for three reasons: (1) the "waiver is expressly limited to incidents occurring inside Unit M303"; (2)

1. In the Lease Agreement, Orchard Park Apartments, LLC, is referred to as "Landlord." This opinion will use that same reference.

2. *Alack v. Vic Tanny Int'l of Missouri, Inc.,* 923 S.W.2d 330 (Mo. banc 1996).

"[t]he attempt at exculpatory language in the *Lease Agreement* is not clear, not conspicuous, and therefore cannot clearly and unmistakably waive [Fuller's] claims [sic]"; and (3) "[TLC's] exculpatory language attempts to waive any imaginable claim including intentional torts, and for that reason, is duplicitous, indistinct, uncertain and ambiguous, and therefore void under Missouri law." Finally, Fuller argued that "[t]his exculpatory language, and attempted broad use in Apartment leases throughout the community, should be held void as against sound public policy."

The trial court sustained TLC's motion for summary judgment and entered a judgment in its favor on Fuller's claim. This appeal timely followed.

### Standard of Review

"Appellate review of summary judgment is *de novo*." *Roberts v. BJC Health Sys.*, 391 S.W.3d 433, 437 (Mo. banc 2013) (citing *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)).

### Discussion

While Fuller brings six points on appeal, her first point is dispositive. In it, she claims TLC was not entitled to judgment as a matter of law because the exculpatory clause in the Lease Agreement for injuries "occurring on or about the Premises" does not apply to her injury that occurred in the parking lot, in that the Lease Agreement defines "Premises" as her apartment unit M303, and her injury did not occur "on or about" that unit. We agree.

"Releases of future negligence are not void as against public policy, though they are disfavored and strictly construed." *Warren v. Paragon Techs. Grp., Inc.*, 950 S.W.2d 844, 845 (Mo. banc 1997) (citing *Alack v. Vic Tanny Int'l of Missouri, Inc.*, 923 S.W.2d 330, 334 (Mo.

banc 1996)). "'[C]lear and explicit language in the contract is required to absolve a person from such liability.'" *Alack*, 923 S.W.2d at 334 (quoting *Hornbeck v. All American Indoor Sports, Inc.*, 898 S.W.2d 717, 721 (Mo.App. W.D.1995)); *see Vergano v. Facility Mgmt. of Missouri, Inc.*, 895 S.W.2d 126, 128 (Mo.App. E.D.1995) (enforced release where "its terms were simple and clear"). In addition, the language in an exculpatory clause must be unambiguous, unmistakable, and conspicuous. *Alack*, 923 S.W.2d at 337. "'An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract.'" *Id.* (quoting *Rodriguez v. Gen. Accident Ins. Co. of America*, 808 S.W.2d 379, 382 (Mo. banc 1991)); *accord Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009). "'Language is ambiguous if it is reasonably open to different constructions.'" *Ritchie*, 307 S.W.3d at 135 (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007)). "The exculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence." *Alack*, 923 S.W.2d at 337. "The determination of the sufficiency and validity of an exculpatory agreement on the basis of the clarity and simplicity of its terms is a question of law[.]" *Id.* at 338.

"A lease in Missouri acts as both a conveyance and a contract[.]" *Campus Lodge of Columbia, Ltd. v. Jacobson*, 319 S.W.3d 549, 552 (Mo.App. W.D.2010). "'[A] contract must be construed as a whole. It must be viewed from end to end and corner to corner.'" *Id.* (quoting *Parker v. Pulitzer Publ'g Co.*, 882 S.W.2d 245, 249 (Mo.App. E.D.1994)); *accord Alack*, 923 S.W.2d at 343.

■ The Lease Agreement here expressly defines the term "Premises" as apartment unit "M303."[3] Therefore, by definition, the word "premises" as used every place in the Lease Agreement, in and of itself, cannot include any geographical area other than that occupied by apartment unit M303.

The Lease Agreement then proceeds to use that defined term thirty-eight times, almost exclusively in the context of describing Fuller's duties and obligations under the Lease Agreement. While most instances refer to "the Premises," "of the Premises," or "to the Premises[,]" other qualifying terms are used. For example, Fuller was required to give the landlord written notice "when *any portion of the* Premises is out of repair"; Fuller was required to service, maintain, and repair all electrical and mechanical equipment "which *is apart of the* Premises"; Fuller was required to pay "all utilities used *in or about* Premises"; Fuller could have no pets "*on the* Premises" without a separate pet agreement; in addition to a separate pet agreement, Fuller had to obtain written permission from the office before the pet could "be *in or around the* Premises"; any vehicles Fuller had "*on or near the* Premises" had to "be in good condition and working order, properly licensed and roadworthy, must not have significant oil or fluid leaks"; and, Fuller was "allowed to park one vehicle per bedroom *in the* Premises[.]" (Emphasis added).

In contrast, the Lease Agreement refers to one of the Landlord's duties as "*common area* maintenance[.]" (Emphasis added.) Similarly, in mandating Fuller's

compliance with the current "Community Policies" by incorporating that document by reference, the Lease Agreement refers to the entire apartment complex as the "apartment community[.]"

It is in this context that we now turn to paragraph 17—the exculpatory clause—in the Lease Agreement. As relevant here, this paragraph releases "all owners, Landlord and property managers of the Premises" from liability for future negligence on any claim by Fuller for personal injury "occurring *on or about* the Premises[.]" (Emphasis added).[4] The question for our resolution is whether the description of the geographical area identifying the location of the injury of those released claims— "occurring on or about the Premises"— clearly, explicitly, unambiguously, and unmistakably includes the parking lot, where Fuller's injury occurred. We find that it does not.

Under the plain and ordinary language used in the exculpatory clause, the prepositional phrase "on or about the Premises" modifies the word "occurring" by describing the geographical area within which the injuries must have occurred giving rise to the released claims. Because the prepositions in that phrase are used in the disjunctive, the only claims released by Fuller were those for injuries occurring either "on . . . the Premises" or "about the Premises." By defining the word "premises" as "M303," the former phrase—"on . . . the Premises"—clearly references only the geographical area described as M303, the apartment unit leased by Fuller. *See Moore v. Commercial Union Ins. Co.,* 754 S.W.2d 16, 18 (Mo.App. E.D.1988) (petition

---

**3.** The Lease Agreement uses both "Premises" and "premises," sometimes with a preceding definite article "the" and sometimes without. Neither party draws any distinction between these inconsistencies, so we draw none.

**4.** Paragraph 17 also obligates Fuller to indemnify Landlord, all owners, and property managers of the Premises for any claims brought by "any person *on or near the* Premises at the invitation or allowance" of Fuller. (Emphasis added).

alleged negligence of plaintiff regarding a breach of duty by acts done only on the adjoining premises, not *on the* insured *premises* ). Therefore, "on ... the Premises" does not clearly, explicitly, unambiguously, and unmistakably include the parking lot.

"When viewed in the context of the law governing exculpatory clauses," *Alack,* 923 S.W.2d at 337, neither does the geographical area descriptor, "about the Premises." We reach this conclusion for three reasons. First, when used as a preposition, as here, "about" has two geographical meanings— "in a circle around: on every side: around" and "in the immediate neighborhood of: near." [5] MERRIAM-WEBSTER DICTIONARY (11th Ed.). The first meaning—"in a circle around: on every side: around[,]" when applied to the Premises, defined as M303, clearly includes the outermost perimeter *around* unit M303; it does not clearly and explicitly include a parking lot located some unknown distance from unit M303.

Whether the parties intended for "about" to have the second meaning—"in the immediate neighborhood of: near"—is not clear in the context of the exculpatory clause itself and the whole of the Lease Agreement because of the use of the phrase "*near* the Premises." That phrase is used within the exculpatory clause by imposing upon Fuller the indemnification obligation for claims made by "any person on or *near the Premises* at the invitation or allowance" of Fuller. (Emphasis added). It is also used in paragraph 21, which requires any vehicles Fuller had "on or *near the Premises* " to "be in good condition and working order, properly licensed and roadworthy, must not have significant oil or fluid leaks[.]" (Emphasis added). The specific and express use of the phrase "near the Premises" in the exculpatory clause and elsewhere in the Lease Agreement could reasonably indicate that it has a distinct and different meaning than the phrase "about the Premises," which is used in close proximity to it. This would support the reasonable construction that "about the Premises" was used to convey the more narrow first meaning of "about"—"in a circle around: on every side: around"—and that "*near* the Premises" was used when the broader second meaning of "about"—"in the immediate neighborhood of: near"—was intended. On the other hand, the similarity of the second meaning of "about" and the word "near" could also support the reasonable construction that the two different phrases mean the same thing. The existence of these two reasonable constructions creates an ambiguity in the exculpatory clause. *See Ritchie,* 307 S.W.3d at 135.

Second, "about" the premises is used in another place in the Lease Agreement, and the context of that usage strongly suggests it denotes a very limited and narrower geographical scope. In paragraph 13, the Lease Agreement requires Fuller to pay "all utilities used in or *about* Premises[.]"

---

5. The complete definition for "about," when used as a preposition, is:
    **1:** in a circle around: on every side of: around
    **2 a:** in the immediate neighborhood of: near
    **b:** on or near the person of
    **c:** in the makeup of <a mature wisdom *about* him>
    **d:** at the command of <has his wits *about* him>
    **3:** engaged in <act as if they know what they're *about*—T.S. Matthews>
    **4 a:** with regard to: concerning <spoke *about* his past>
    **b:** concerned with
    **c:** fundamentally concerned with or directed toward <poker is *about* money—David Mamet>
    **5:** over or in different parts of
MERRIAM WEBSTER DICTIONARY (11th Ed.).

(Emphasis added). As used here, "about" the premises indicates a very close geographical relationship to the Premises—apartment M303—such as an outside light that protrudes from the unit or that hangs over an adjoining common area lighting an entry to that unit. Nothing in this language requires Fuller to pay the utilities for the parking lot.

Third, the Lease Agreement uses the terms "common area" and "apartment community" elsewhere to refer, respectively, to the geographical location of the common areas, such as parking lots, and to the geographical location of the entire apartment complex, which includes all common areas and apartment units located therein. This explicit use of broader, more inclusive terms elsewhere in the Lease Agreement coupled with the omission of those terms in the exculpatory clause and its explicit use of a term—"Premises"—that by its definition is not a common area, implies the intentional omission, rather than the inclusion, of the common areas in that clause. In other words, if the common areas had been intended to be included, that specific term—"common areas"—would have been used just as it was used elsewhere in the Lease Agreement. At the very least, its omission creates a substantial indistinctness and uncertainty as to the words used in the exculpatory clause and, therefore, an ambiguity as to whether the parking lot, which is a common area, is included. *See Alack*, 923 S.W.2d at 337 (ambiguity arises when there is duplicity, indistinctness, *or* uncertainty in the meaning of the words used in the contract.); *accord Ritchie*, 307 S.W.3d at 135.

TLC, referring to *Abbott v. Epic Landscape Prods., L.C.*, 361 S.W.3d 13 (Mo.App. W.D.2011), claims that "[t]he most recent appellate decision regarding the validity of exculpatory clauses rejects Plaintiff's argument that the injuries must occur within the leased premises." In *Abbott*, the tenant brought a personal-injury negligence action against the landlord and snow maintenance contractor after a slip and fall on ice in the parking lot that resulted in injuries to the tenant's leg and eventually led to amputation. *Id.* at 14–15. What TLC fails to mention or take into account, however, is that the exculpatory clause upheld and enforced in *Abbott* specifically and explicitly included the "common areas," *id.* at 17–18, unlike the exculpatory clause in the Lease Agreement TLC relies upon here.

Finally, TLC argues that the heading of paragraph 21 of the Lease Agreement—"Vehicles on or about Premises"—provides clarity. It does not. This heading, in and of itself, imposes no right, duty, or obligation upon either Fuller or Landlord; it merely serves a non-substantive function to generally describe the contents of the paragraph that follows it. The operative part of paragraph 21 is in the language used in its body, and that language does not employ the phrase at issue.[6] Therefore, this heading has no bearing upon the use of a similar phrase in the exculpatory clause that operates to substantially shift the rights and obligations between the parties.

"There must be no doubt that a reasonable person agreeing to an exculpa-

---

6. Paragraph 21 of the Lease Agreement reads:

    21. **Vehicles on or about Premises**
    Any vehicles on or near the Premises must be in good condition and working order, properly licensed and roadworthy, must not have significant oil or fluid leaks, and Tenant(s) are allowed to park one vehicle per bedroom in the Premises, except that one room or studio apartments or Tenant(s) with children of driving age may be granted a waiver of this provision based on need and hardship, at Landlord's sole discretion.

tory clause actually understands what future claims he or she is waiving." *Alack*, 923 S.W.2d at 337–38. From the above and foregoing, we conclude that a reasonable person would not understand that the exculpatory clause in the Lease Agreement, when the Lease Agreement is strictly construed from end to end and within its corners, clearly, explicitly, and unmistakably waives claims for injuries occurring in the parking lot. For this reason, the exculpatory clause does not apply to Fuller's claim, as a matter of law, and the trial court erroneously applied it to grant summary judgment to TLC. Fuller's first point is granted.

Finding the exculpatory clause is not applicable by its own terms under Fuller's first point, we need not address any other reasons it may not apply as raised in her other points.

### *Decision*

The trial court's judgment granting summary judgment in favor of TLC is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

DON E. BURRELL, C.J.—concurs in majority opinion.

NANCY STEFFEN RAHMEYER, J.—concurs in majority opinion and writes separate concurring opinion.

JEFFREY W. BATES, J.—concurs in majority opinion; concurs in J. RAHMEYER'S separate concurring opinion; concurs in J. FRANCIS' separate concurring opinion.

DANIEL E. SCOTT, J.—concurs in result and writes separate opinion concurring in result.

WILLIAM W. FRANCIS, JR., J.—concurs in majority opinion; concurs in J. RAHMEYER'S separate concurring opinion and writes separate concurring opinion.

MARY W. SHEFFIELD, J.—concurs in majority opinion.

### NANCY STEFFEN RAHMEYER, J.

I concur in the majority opinion but write further to address the public policy issue raised by Fuller. I begin this concurrence by also noting that a lease, such as the one at issue in this case, is both a conveyance and a contract. It is significant to remind the reader of that fact because it seems that in the modern lease the contract terms have dwarfed what used to be a land conveyance. These contract terms, including the exculpatory clause at issue in this case, are inserted into leases with no negotiation and no legal consideration, all to the detriment of the tenant.

If we were to analyze this Lease as a contract, we must look to the four corners of the agreement as a whole to review the language of the entire contract. *Brewer v. Missouri Title Loans*, 364 S.W.3d 486, 487, 492 (Mo. banc 2012). We would apply traditional Missouri contract law in looking at the agreement as a whole to determine the conscionability of the provisions of the agreement. *Id.* at 487. Furthermore, the contract language is to be strictly construed against the party claiming the benefit of the contract. *Alack v. Vic Tanny Intern. of Missouri, Inc.*, 923 S.W.2d 330, 338 (Mo. banc 1996); *Warren v. Paragon Technologies Group, Inc.*, 950 S.W.2d 844, 845 (Mo. banc 1997). "The purpose of the unconscionability doctrine is to guard against one-sided contracts, oppression and unfair surprise." *Brewer*, 364 S.W.3d at 492–93. A review of this contract shows that it is as one-sided, oppressive, and unfair to the tenant as the contract in *Brewer*.

Unconscionability of a contract has two aspects, procedural and substantive: "[p]rocedural unconscionability relates to the formalities of making the contract, whether or not one of the parties exerted high pressure on the other party during the negotiations, misrepresented material facts to the other party, or had a significantly unequal bargaining power over the other"; "[s]ubstantive unconscionability focuses on the contract's terms[,] whether or not they are unduly harsh." *Kansas City Urology, P.A. v. United Healthcare Services*, 261 S.W.3d 7, 14–15 (Mo.App. W.D. 2008). Our supreme court recognized that "unconscionability can be procedural, substantive or a combination of both. There is no need in all cases to show both aspects of unconscionability." *Ruhl v. Lee's Summit Honda*, 322 S.W.3d 136, 139 n. 2 (Mo. banc 2010). Further, "procedural unconscionability does not need to be significant when substantive unconscionability is present." *Shaffer v. Royal Gate Dodge, Inc.*, 300 S.W.3d 556, 559 (Mo.App. E.D.2009) (internal quotations omitted). If gross procedural unconscionability of a contract exists, not much evidence is required of substantive unconscionability for a contract to be unenforceable, and vice versa.[1]

There are two paragraphs in this Lease that offend our traditional notions of a conscionable agreement. Paragraph 22C purports to be a waiver by the tenant of a jury trial on any claims the tenant "may make that arises out of this [L]ease." Paragraph 17, as set out in the majority opinion, purports to be a waiver by the tenant of any future claims against the landlord and further provides that the ten-

ant agrees to indemnify the landlord for all claims of the tenant. The parties agreed that the contract was not negotiated nor was it negotiable. It was a "take it or leave it" lease for apartment rental.

*Brewer* is instructive on the issue of an unconscionable agreement. Brewer borrowed money from a title company. *Brewer*, 364 S.W.3d at 487. The agreement contained a clause that Brewer must resolve any claim against the title company in binding, individual arbitration governed by the Federal Arbitration Act. *Id.* No customer ever successfully renegotiated the terms of the contract, including the arbitration provisions, and although Brewer waived her right to litigate in court, the title company was allowed to use the judicial process to enforce its rights. *Id.* When Brewer brought a complaint against the title company in a class action suit, the title company filed a motion to dismiss and to compel arbitration. *Id.* at 488. The trial court found the class arbitration waiver unconscionable and unenforceable and further found that it would be difficult for a consumer to understand that there was a disparity of bargaining power, that the provision was one-sided because only customers gave up their rights while the title company did not. *Id.* The Supreme Court noted that "[t]he purpose of the unconscionability doctrine is to guard against one-sided contracts, oppression and unfair surprise" and that "[o]ppression and unfair surprise can occur during the bargaining process or may become evident later, when a dispute or other circumstances invoke the objectively unreasonable terms." *Id.* at 492–93. "In either case, the uncon-

---

1. In *Brewer*, a majority of our Supreme Court indicated that future Missouri judicial decisions should "limit review of the defense of unconscionability" to "a discussion of facts relating to unconscionability impacting the formation of the contract." 364 S.W.3d at 492 n. 3. Although, for ease of discussion, I use the traditional phrases of "procedural unconscionability" and "substantive unconscionability" in my concurring opinion, I limit my discussion of the facts to those facts that relate to unconscionability impacting the formation of the Lease.

scionability is linked inextricably with the process of contract formation because it is at formation that a party is required to agree to the objectively unreasonable terms." *Id.* at 493. As in *Brewer,* the facts here demonstrate that the terms of the agreement are one-sided, oppressive, and non-negotiable.

We have long upheld the principle of personal responsibility for one's actions. As long ago as 1892, our Supreme Court in *Blanton v. Dold,* 109 Mo. 64, 18 S.W. 1149, 1151 (1892), recognized the general principles of negligence in an employer-employee context:

> It is familiar law, and need here be expressed but briefly, that the master is not bound to supply the latest or the best machinery or appliances for the work he undertakes; still less does he insure his employees' [sic] safety. His obligation in this relation is to use such care as should characterize a person of common prudence in the same position that such machinery as is furnished be reasonably safe for the purpose to which it is intended to be devoted. The burden of proof was on plaintiff to establish, directly or by just inference, some want of care to which his injury might fairly and reasonably be traced.

The court continued:

> [T]his court unanimously declared [in an 1870 case] that an employee "assumes the risk, more or less hazardous, of the service in which he is engaged; but he has a right to presume that all proper attention shall be given to his safety, and that he shall not be carelessly and needlessly exposed to risks not necessarily resulting from his occupation, and

which might be prevented by ordinary care and precaution on the part of his employer." That declaration is better recognized in the law to-day than at the time it was made. An express contract, in most solemn form, by an employe, [sic] exempting his master from liability for negligence in the performance of his personal duties towards the former, has been often declared in American courts illegal, its subject-matter being considered as contrary to a sound *public policy.*

(Emphasis added.)[2]

"Long established common law principles authorize courts to compel tort-feasors to compensate those they intentionally or negligently injure." *Townsend v. Townsend,* 708 S.W.2d 646, 647 (Mo. banc 1986). Missouri adopted the common law by statute in 1825. Section 1, R.S. 1825 (currently section 1.010, RSMo 2000). The principle of personal responsibility for one's actions is at the bedrock of our civilized society.

The language in this Lease contains language that TLC and all unidentified people including the "agents, employees, servants, invitees, successors and assigns" are not liable for their actions for "any cause whatsoever" "on or near the Premises." The purported exculpatory clause in this case is more troubling because not only does it include claims that cannot be released in its general release language, but it also attempts to obtain indemnification from the tenant for injuries to its invitees if the invitee is injured by the landlord! Hypothetically, if a truck driver delivering a package to the tenant is injured when the landlord fails to put up a block to a sink-

2. Although the term public policy is difficult to define, "it is generally said to be that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good; it is synonymous with the 'policy of the law' and 'the public good.' " *Brawner v. Brawner,* 327 S.W.2d 808, 812 (Mo. banc 1959), *overruled on other grounds by Townsend v. Townsend,* 708 S.W.2d 646, 649–50 (Mo. banc 1986).

hole somewhere on the property, this Lease claims the tenant must indemnify the landlord for the landlord's own negligence. No reasonable person would agree to indemnify the landlord for an event totally out of the control of the tenant. "Our traditional notions of justice are so fault-based that most people might not expect such a relationship to be altered, regardless of the length of an exculpatory clause, unless done so explicitly. General language will not suffice." *Alack*, 923 S.W.2d at 337.

Furthermore, the exculpatory clause as written in this Lease apparently waives "any actions" on the part of the landlord. That would include even the warranty of habitability. In *Chiodini v. Fox*, 207 S.W.3d 174, 176 (Mo.App. E.D.2006), a landlord claimed the tenant breached the contract. Fox, who had signed the lease prior to viewing the house, discovered exposed wiring in an unfinished billiard room. *Id.* at 175. The Eastern District of this Court noted, "It is well-settled in Missouri 'that a landlord impliedly warrants the habitability of leased residential property.'" *Id.* at 176 (quoting *Detling v. Edelbrock*, 671 S.W.2d 265, 270 (Mo. banc 1984)). A landlord agrees to provide facilities and services that are "vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes." *Moser v. Cline*, 214 S.W.3d 390, 394 (Mo.App. W.D.2007).

> Habitability is measured by community standards, generally reflected in local housing and property maintenance codes. In order to state a cause for breach of an implied warranty of habitability, the tenant must prove four elements: (1) entry into a lease for residential property; (2) the subsequent development of dangerous or unsanitary conditions on the premises materially affecting the life, health and safety of the tenant, (3) reasonable notice of the defects to the landlord; and (4) subsequent failure to restore the premises to habitability.

*Chiodini*, 207 S.W.3d at 176; see also, *Kolb v. DeVille I Properties, LLC*, 326 S.W.3d 896, 902–03 (Mo.App. W.D.2010) (where bedbug infestation was a breach of the implied warranty of habitability).

Likewise, in the Restatement (Second) of Torts, it has long been held that a plaintiff, who by contract or otherwise expressly agrees to accept a risk of harm arising from defendant's negligent or reckless conduct, cannot recover, unless the agreement is invalid as contrary to public policy. RESTATEMENT (SECOND) OF TORTS § 496B (1965). The question is whether the agreement is freely and fairly made, between parties who are in an equal bargaining position and there is no social interest in which they interfere. *Id.* If so, it will generally be upheld; however, there are certain agreements which will not be enforced:

> c. ... [W]here the agreement is drawn by the defendant and the plaintiff passively accepts it, its terms will ordinarily be construed strictly against the defendant. In particular, general clauses exempting the defendant from all liability for loss or damage will not be construed to include loss or damage resulting from his intentional, negligent, or reckless misconduct, unless the circumstances clearly indicate that such was the plaintiff's understanding and intention.

> . . . .

> j. ... An express agreement for the assumption of risk will not, in general, be enforced where there is such disparity of bargaining power between the parties that the agreement does not represent a free choice on the part of the plaintiff. The basis for such a result is the policy of the law which relieves the

party who is at such a disadvantage from harsh, inequitable, and unfair contracts which he is forced to accept by the necessities of his situation. The disparity in bargaining power may arise from the defendant's monopoly of a particular field of service, from the generality of use of contract clauses insisting on the assumption of risk by all those engaged in such a field, so that the plaintiff has no alternative possibility of obtaining the service without the clause; or it may arise from the exigencies of the needs of the plaintiff himself, which leave him no reasonable alternative to the acceptance of the offered terms.

*Id.*

TLC admitted that this contract was not negotiable and could not be modified even if the tenant asked. Thus, there was no negotiation between the parties. " 'In Missouri, an adhesion contract, as opposed to a negotiated contract, has been described as a form contract created and imposed by a stronger party upon a weaker party on a 'take this or nothing basis,' the terms of which unexpectedly or unconscionably limit the obligations of the drafting party.' " *Grossman v. Thoroughbred Ford, Inc.,* 297 S.W.3d 918, 921 (Mo.App. W.D.2009) (quoting *Swain v. Auto Servs., Inc.,* 128 S.W.3d 103, 107 (Mo.App. E.D. 2003)). Even assuming there was negotiation, the public policy of Missouri is that all contracts should be negotiated in good faith. "It is unconscionable to take advantage of an unequal bargaining position and obtain a contract or term which results in a gross disparity of values exchanged." 15 Mo.CODE REGS. ANN. Unconscionable Practices 60–8.080 (2013).

We have codified that belief in the Uniform Commercial Code ("UCC"). Specifically, "Section 407.020 has at all times proscribed deceptive or fraudulent acts in connection with the sale of merchandise[.]" *Hess v. Chase Manhattan Bank, USA, N.A.,* 220 S.W.3d 758, 768 (Mo. banc 2007). Although the UCC may not have direct application to consumer real estate leases, the philosophy expressed there has valid application here.

Section 434.100 provides additional support that Missourians have a right to expect good faith in contract negotiation. Section 434.100.1 states, in part, "in any contract or agreement for public or private construction work, a party's covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence or wrongdoing is void as against public policy and wholly unenforceable." It defies belief to think that the legislature would provide for good faith in contracts between people with equal bargaining power and for public contracts but force tenants to accept contracts with no negotiation and an absence of good faith from landlords who are allowed to escape any liability for their future negligence.[3]

The exculpatory clause in this case is far more egregious than the clause in *Brewer.* As opposed to the clause in *Brewer,* this clause did not just involve a method of resolving disputes between the parties. Thus, the clause in this Lease does not provide for an alternative method of dispute resolution, it calls for no remedy at all for the tenant but all remedies to be available to the landlord. This clause prevented any action or claims be brought against the landlord. This defies our Constitution.

---

3. In Missouri, according to the 2010 census, there are 1,669,216 people living in renter-occupied housing units, or approximately one-third of the total population living in housing. *Available at http://factfinder2. census.gov/faces/tableservices/isf/pages/ product view.xhtml?pid=DEC_10_DP_DPDP1* (last visited on June 3, 2013).

Article 1, Section 14, of the Missouri Constitution provides "That the courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or character[.]"

TLC argues that the clause in this Lease also makes the tenant liable for the landlord's negligence to others, not only in the apartment unit but in the common areas even though the landlord referred to the common areas as its duty in Paragraph 6. The tenant cannot control the common areas. To shift the risk of liability to the tenant for all common areas is outside the understanding of any reasonable person.

We have yet to consider the policy implications of upholding these types of exculpatory clauses in residential leases. The first case which addressed the exculpatory clause and which has been cited for the broad principle that exculpatory clauses are not against public policy is *Alack v. Vic Tanny Intern. of Missouri, Inc.,* 923 S.W.2d 330 (Mo. banc 1996). *Alack* was a case involving a general exculpatory clause contained in a health club contract. *Id.* at 332. We also note that, as explained in *Milligan v. Chesterfield Village GP, LLC,* 239 S.W.3d 613, 621 n. 7 (Mo.App. S.D. 2007):

> even *Alack's,* dissenters expressed strong personal and policy concerns with exculpatory clauses[.] 923 S.W.2d at 339–40 (Limbaugh, J., dissenting), at 342 (Robertson, J., dissenting and joined by Covington, J.). There are yet stronger reservations as to residential leases, especially adhesion leases of low-income housing. Mr. Alack, if unwilling to give up his legal rights against Vic Tanny, might have joined a different health club or the local Y, bought his own exercise equipment, or simply forgone his exercise plans. Thus, freedom of contract outweighed the public policy disfavoring a health club's exculpatory clause. *Id.* A low-income family cannot forgo housing, yet may be unable to buy a home, have few rental options, and lack any power to bargain away onerous lease terms. As more low-income lessors add exculpatory clauses to their lease forms, low-income lessees' "freedom of contract" may become increasingly illusory.

*Warren v. Paragon Technologies Group, Inc.,* 950 S.W.2d at 845, involved the language in a non-liability clause which was tried to a jury. Nevertheless, in *Warren,* the court cited *Alack* for the general principle that exculpatory clauses were not against public policy but then stated, "[a]lthough the validity of a non-liability clause is a question of law for the court, [ ] the court can reach this question only after the parties comply with the applicable pleading and evidence requirements." *Id.* at 845.[4]

This Court, in *Milligan,* citing to *Warren* and *Alack,* decided that the point "makes a narrow claim. It asserts, as a matter of law, [the exculpatory clause] is unenforceable because 'from any cause whatsoever' does not expressly exclude intentional torts, gross recklessness, or ac-

---

4. I consider the holding of *Warren* to be confusing. The trial court refused to enforce a non-liability clause and the cause was heard by a jury. Although citing to *Alack* for the proposition that a non-liability clause was not void, nonetheless, the cause was remanded for a new trial despite the clause. The focus of the decision was whether the landlord had met its burden to prove its affirmative defense of release, and, if so, whether, in light of the jury's verdict for the tenant and the Supreme Court's intervening decision in *Alack,* the tenant should be permitted an opportunity to retry the case. *Warren,* 950 S.W.2d at 845–46. The court in *Warren* apparently did not reach the issue of unconscionability of the exculpatory clause, but focused only on the propriety of such clauses in the context of public policy.

tivities involving the public interest." *Milligan*, 239 S.W.3d at 616. In *Milligan*, this Court was not asked nor did it consider whether the lease at issue was unconscionable or against the public policy of the State of Missouri.

It is time to address the very real issues facing Missourians who are injured by the negligence of their landlords. This Lease was partially a conveyance. TLC agreed to convey the premises of M303 to Fuller for a period of time and Fuller agreed to pay the fair market value for the conveyance. The additional contract language contradicts our common law and statutory provisions of good faith and fair dealing in the bargaining of contracts. An unconscionable contract is one that "no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept on the other." *Hume v. U.S.*, 132 U.S. 406, 10 S.Ct. 134, 136, 33 L.Ed. 393 (1889). The average consumer would not understand that signing a lease for the rental of an apartment unit would effectively negate all prior negligence law and allow the landlord to show no regard for the tenant's safety. This clause is clearly unconscionable and, as such, is against public policy.

### WILLIAM W. FRANCIS, JR., J.

I concur with the majority opinion in this case. I also join in the concurring opinion submitted by Judge Rahmeyer, and amplify her discussion concerning the absence of any negotiation about the exculpatory clause.

The record before us demonstrates why exculpatory clauses are disfavored and strictly construed. *Warren v. Paragon Technologies Group, Inc.*, 950 S.W.2d 844, 845 (Mo.1997).

When we examine contracts, we identify consideration or "bargained for exchange" as a necessary element. In this case, there was no "bargained for exchange" with respect to the unconscionable exculpatory clause contained in the lease. The parties agree in this case that there was no consideration assigned to the exculpatory clause and Appellant had no opportunity to bargain in any way for elimination of the exculpatory clause. "Bargained for exchange" is not present when a stronger party, of admitted unequal bargaining power, forces obligations and abandonment of remedies, on a weaker party. In the absence of special consideration or bargaining for an exculpatory clause in a residential lease, those clauses should be declared unconscionable and void as against public policy.

### DANIEL E. SCOTT, J.

I concur in the result. There is no need to belabor my respectful disagreement with the principal opinion. Largely, I do not think *Alack* is implicated for reasons noted by our Eastern District in *Holmes v. Multimedia KSDK, Inc.*, 395 S.W.3d 557, 560–61 (Mo.App. E.D.2013).

I would focus on TLC's failure to offer an adequate factual record. Our issue is not the release's validity *per se*, but its applicability. Did Fuller fall "about" her apartment unit M303?

That issue was, at least in part, one of fact that TLC did not develop in its summary judgment record. Indeed, for summary judgment purposes, Fuller expressly *denied* that she was injured "near Unit 303 in Building M." Thus, judgment was premature unless we conclude as matter of law that all parts of all apartment-complex parking lots are always "about" each and every apartment unit. As I am loath to be so dogmatic, I would reverse on this basis and remand.